JAMES LEWIS CALDWELL MCFADDIN, PETITIONER, ET AL.,[1] *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 107896, 108082–108084, 109031–109034.

Promulgated July 9, 1943.

*Percy W. Phillips, Esq.*, for the petitioners.
*Stanley B. Anderson, Esq.*, for the respondent.

[1] Proceedings of the following petitioners are consolidated herewith: W. P. H. McFaddin, Jr.; Mamie McFaddin Ward; and W. V. McFaddin.

396

398

OPINION.

Arnold, *Judge:* Respondent determined (1) that petitioners' respective shares of the income of the trust should be increased, due to (a) his disallowance of depletion claimed on payments under the Humble lease in excess of royalties retained by the lessee, (b) his treatment of profits on the sale of Central Gardens lots as ordinary rather than as capital gain; (2) that such portions of petitioners' distributive shares of the income of the trust as were attributable to royalties and to sales of trust property were separate and not community income; and (3) that with respect to petitioners James Lewis Caldwell McFaddin, W. P. H. McFaddin, Jr., and W. V. McFaddin no deduction was allowable for attorney fees incurred in 1938 for the recovery of an overpayment of Federal income tax.

The petitioners allege error in regard to each of these determinations. They also allege error in that the respondent failed to exclude from gross income of the trust the amounts received by it and reported in its returns for the fiscal years ended February 28, 1938, and February 28, 1939, as payments upon the indebtedness charged off in a previous year as a bad debt. It is also alleged that, in determining the income of the trust for its fiscal years involved, respondent erred in allocating no part of the general expense of the trust to the amounts which he had determined to be distributable as separate income.

The issues to be considered first are those relating to the amount of the trust's income for the fiscal years in question. These pertain to the allowance of depletion upon payments under the Humble lease, the treatment of profits upon the sale of Central Gardens lots, and the treatment of bad debt recoveries. They will be taken up in the order listed.

The respondent disallowed the depletion claimed by the trust upon the annual payments under the Humble lease to the extent that such payments exceeded royalties retained by the lessee pursuant to section 4 of the lease. The royalties so retained amounted to $4,301.64 in 1938 and $4,059.49 in 1939. Respondent contends that the portion of the annual payment in excess of the retained royalties for each year was rental on which no depletion was allowable. and cites as authority *Commissioner* v. *Wilson* (C. C. A., 5th Cir., 1935) 76 Fed. (2d) 766; and *Continental Oil Co.*, 36 B. T. A. 693. He also attempts to distinguish our decision in *Alice G. K. Kleberg*, 43 B. T. A. 277.

In the *Wilson* and *Continental Oil Co.* cases, *supra*, under substantially different facts, it was held that the amounts paid under oil leases for the purpose of obtaining delays in production were delay rentals and not royalties. *Continental Oil Co.* held that an amount which was clearly a delay rental was not subject to depletion. The *Wilson* case did not concern itself with depletion.

In *Alice G. K. Kleberg*, *supra*, we had the question of whether an amount described in an oil lease as "rental" was to be treated as a delay rental, not subject to depletion, or as an advance royalty, upon which depletion was allowable. We there held, under facts quite similar to those here involved, that the payment, although called a "rental," was really an advance royalty and as such subject to depletion.

The characteristics of delay rentals have been fully considered in previous cases and need not be repeated here. (See *Houston Farms Development Co.* v. *United States* (C. C. A.. 5th Cir.. 1942), 131 Fed. (2d) 577; *Commissioner* v. *Wilson, supra; Alice G. K. Kleberg, supra; Continental Oil Co., supra; J. T. Sneed, Jr.*, 33 B. T. A. 478.)

We think here as in the *Kleberg* case the payments in 1938 and 1939 were in the nature of advance royalties. The primary purpose of the

lease was the exploration and development of the premises for the production of oil and gas and other minerals therefrom, in which lessor would profit from the royalties obtained from the oil and gas produced. The payments were not for delay in development of the premises for oil, gas, and other minerals, as the lessee was bound to make them regardless of exploration and development of the premises. The lessee had "the right to retain and own all of the royalties on production from said premises accruing or to accrue during each year until such royalties during each year amount in value to the equivalent of the rental paid hereunder for that year." The royalties belonged to the lessor and instead of being paid direct they were to be withheld to reimburse lessee to the extent of the payments. The payments were, therefore, in the nature of guaranteed minimum royalties and not delay rentals. If the payments had been made and accepted for delay in exploring and developing the premises, the lessee would have no right to reimbursement out of the royalties produced. The fact that the premises did not produce sufficient royalties during the years in question to completely reimburse lessee for the amounts paid, in our opinion, does not justify us in treating a portion of the moneys paid as delay rentals and a portion as royalties, as respondent contends. We think such construction would do violence to the terms of the lease and the intention of the parties in entering therein.

The fact that the lease refers to the payments here in question as rentals is not controlling in determining the right to depletion thereon. *Alice G. K. Kleberg, supra.* Royalties and bonuses under oil, gas, and mineral leases have some resemblance to rentals. See *Burnet* v. *Harmel*, 287 U. S. 103; *Von Baumbach* v. *Sargent Land Co.*, 242 U. S. 503; *Commissioner* v. *Laird* (C. C. A., 5th Cir., 1937), 91 Fed. (2d) 498. Nevertheless they are entitled to depletion deduction, *Murphy Oil Co.* v. *Burnet*, 287 U. S. 299, and without regard to whether there was actual production during the year in which paid, *Herring* v. *Commissioner*, 293 U. S. 322.

It is our opinion that the annual payments were not delay rentals, but in the nature of advance royalties and as such subject to depletion, and we so hold.

The next question, relating to the income of the trust for its fiscal years ended February 28, 1938, and February 28, 1939, is whether the profits realized upon the sale of Central Gardens lots are taxable as capital gains as contended by petitioners, or as ordinary gains as determined by respondent.

Section 117 (b) of the Revenue Act of 1936 and section 117 (a) of the Revenue Act of 1938 both provide that the term "capital asset" does not include property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

The petitioners contend that Central Gardens was not held by the trust primarily for sale to *its* customers in the ordinary course of *its* trade or business. The proposition, as stated in petitioners' reply brief, is "that the sale of real estate in lots through a broker is no more than an investment operation by the trustees, and that they did not hold the property 'primarily for sale to customers in the ordinary course of [their] trade or business'. The business was that of the brokers." *Higgins* v. *Commissioner*, 312 U. S. 212 (1941), is cited by petitioners as having given a restricted definition of "trade or business" and they claim that under the authority of that decision and under the statute, the trust was not engaged in a trade or business in connection with the sale of Central Gardens lots.

Whether or not a particular activity in which a taxpayer engages constitutes a trade or business must depend upon the facts in the case. *Higgins* v. *Commissioner, supra.* The Central Gardens development was for the purpose of profit from the sale of lots to customers. Such sales were frequent and continuous. and not isolated or casual. The sale of these lots was a trade or business. *R. J. Richards*, 30 B. T. A. 1131; affd. (C. C. A., 9th Cir., 1936). 81 Fed. (2d) 369; *Willard Pope*, 28 B. T. A. 1255; *Ehrman* v. *Commissioner* (C. C. A., 9th Cir., 1941), 120 Fed. (2d) 607; certiorari denied, 314 U. S. 668.

It is an elementary rule of agency that the act of an agent, within the scope of his authority, is the act of his principal. The relationship here between the trust and Dunn was no more than that of principal and agent. Dunn, a licensed real estate broker, had undertaken to sell lots in Central Gardens as agent for the trust. The trust retained title to the property and made deeds when the lots were sold. Section 1 of the trust instrument authorizes the trustees to engage in the business of subdividing real estate and to engage agents. The fact that, to a large extent, the trustees confided the management of the sales to their agent does not make the business any the less that of the trust. The business is that of the seller and not the agent. *Commissioner* v. *Boeing* (C. C. A.. 9th Cir.. 1939), 106 Fed. (2d) 305; certiorari denied. 308 U. S. 619 (1939); *Welch* v. *Solomon* (C. C. A., 9th Cir., 1938), 99 Fed. (2d) 41; *R. J. Richards, supra; Willard Pope, supra.* The purchasers of the lots dealt with the trust as well as with Dunn. They were customers of the trust.

On this issue we sustain respondent's determination.

The final issue relating to the amount of the income of the trust for the fiscal years involved is whether certain amounts which had been charged off and taken as a bad debt deduction in a previous year, resulting in no tax benefit, are includible as taxable income in the years of recovery.

The petitioners rely upon section 116 of the Revenue Act of 1942 and contend that the amounts referred to should be excluded from the income of the trust for the years involved.

Section 116 of the Revenue Act of 1942 added to section 22 (b) of the Internal Revenue Code and to the corresponding provisions of the Revenue Act of 1938 and prior revenue acts a new subsection providing for the exclusion from gross income of certain recoveries of bad debts, prior taxes, and delinquency amounts. This new subsection was made effective retroactively under the Code with respect to taxable years beginning after December 31, 1938, and under prior revenue acts as if it were a part thereof on their respective enactment dates.

As amended, sections 22 (b) of the Revenue Acts of 1936 and 1938, applicable to the fiscal years of the trust here involved, exclude from gross income:

(12) RECOVERY OF BAD DEBTS, PRIOR TAXES, AND DELINQUENCY AMOUNTS.—Income attributable to the recovery during the taxable year of a bad debt, * * * to the extent of the amount of the recovery exclusion with respect to such debt * * *. For the purposes of this paragraph:

(A) DEFINITION OF BAD DEBT.—The term "bad debt" means a debt on account of worthlessness or partial worthlessness of which a deduction was allowed for a prior taxable year.

* * * * * * *

(D) DEFINITION OF RECOVERY EXCLUSION.—The term "recovery exclusion", with respect to a bad debt, * * * means the amount, determined in accordance with regulations prescribed by the Commissioner with the approval of the Secretary, of the deductions or credits allowed, on account of such bad debt, * * * which did not result in a reduction of the taxpayer's tax under this chapter * * * or corresponding provisions of prior revenue laws, reduced by the amount excludible in previous taxable years with respect to such debt, tax, or amount under this paragraph.

As the parties have stipulated that the trust derived no tax benefit from the deduction allowed in 1933, we hold that the amounts of $3,333.33 and $716.67 were erroneously included in the returns of the trust for its fiscal years ended February 28, 1938, and February 28, 1939, respectively.

As to the community property issue, the petitioners contend that from the inception of the trust their respective interests in the trust estate were community property and the income therefrom was community income as to each. The basis for this contention is that, as there was an outstanding indebtedness of the settlors of approximately $488,000 when the trust was created and the trust instrument provided for the payment of $30,000 annually to Mrs. Ida Caldwell McFaddin, the trust estate was acquired not by gift but upon credit and for an onerous consideration during coverture equivalent to a purchase, which, they contend, under Texas law makes the trust estate community property of the trust beneficiaries and the income therefrom community income. The petitioners also contend that even if some, or all,

of the trust estate was separate property at the inception of the trust, there was such later commingling of separate and community property and income by the trustees that all of the original trust estate had become community property before the taxable years here involved. Property subsequently purchased by the trustees, petitioners say, was also community property because some of it was acquired upon credit and because the money paid therefor was derived from commingled separate and community funds. and if any part of the income therefrom is separate income respondent erred in not allocating a part of the general expenses of the trust to such separate income.

The record discloses that petitioners were married during the taxable years. but their marital status on March 1, 1927, when the deeds were made and the trust created, is not shown, with the possible exception of Mamie McFaddin Ward. and as to her only by inference in that she was named a beneficiary under her present name.

Under Texas law property, and the increase of all lands, acquired before marriage, and by gift, devise or descent after marriage, is separate property, Arts. 4613, 4614. Vernon's Annotated Revised Civil Statutes of Texas (1925).[2] In the absence of evidence that the property comprising the trust was acquired subsequent to the marriage of petitioners, we can not hold that their respective interests in the trust were the community and not the separate property of each of them. However, we need not base our conclusion solely on petitioners' failure to show the marital status of petitioners at the time the deeds and trust instrument were executed.

The first argument is that the property comprising the trust estate is community property because acquired during coverture for credit and upon an onerous consideration. The onerous consideration, it is said, was the credit extended in connection with the outstanding indebtedness of the grantors when the property was conveyed, and the amount payable to Ida Caldwell McFaddin.

Although property acquired by either the husband or wife during marriage. except that which is the separate property of either, shall be deemed the community property of the husband and wife, art. 4619, Vernon's Annotated Revised Civil Statutes of Texas (1925), such presumption is not alone sufficient to support the burden cast upon the petitioner to overcome the presumption of correctness of the Commissioner's determination of deficiency. *W. D. Johnson,* 1 T. C. 1041. Also, such presumption may be rebutted by the evidence. *W. W. Clyde*

---

[2] Art. 4613. All property of the husband. both real and personal, owned or claimed by him before marriage, and that acquired afterwards by.gift, devise, or descent, as also the increase of all lands thus acquired, shall be his separate property. * * *

Art. 4614. All property of the wife. both real and personal. owned or claimed by her before marriage, and that acquired afterward by gift. devise. or descent, as also the increase of all lands thus acquired, shall be the separate property of the wife. * * *

*& Co.* v. *Dyess* (C. C. A., 10th Cir., 1942), 126 Fed. (2d) 719; *Stephens* v. *Stephens* (Tex. Civ. App., 1927), 292 S. W. 290.

Under Texas law the character of property as to its separate or community status is fixed by the facts of acquisition. *Woodrome* v. *Burton* (Tex. Civ. App., 1941), 154 S. W. (2d) 665; *Skinner* v. *Vaughan* (Tex. Civ. App., 1941), 150 S. W. (2d) 260; *MacRae* v. *MacRae* (Tex. Civ. App., 1940), 144 S. W. (2d) 320; *Myers* v. *Crenshaw* (Tex. Civ. App., 1938), 116 S. W. (2d) 1125; *Janes* v. *Gulf Production Co.* (Tex. Civ. App., 1929), 15 S. W. (2d) 1102; *McClintic* v. *Midland Grocery & Dry Goods Co.* (Tex., 1913), 154 S. W. 1157.

We do not think the conveyances in trust were purchases of the trust corpus on credit or upon onerous consideration. The debts of approximately $488,000 were debts of the grantors and it does not appear that the grantors were relieved of their obligations with respect thereto or that the trust, the trustees, or the beneficiaries, were substituted as principal obligors, or that they assumed or agreed to pay the debts. Their action with respect to these obligations was discretionary and not obligatory and confined solely to trust income or corpus. In fact, the trust agreement specifically negatives any intent to impose any obligation whatever on the beneficiaries in the nature of a purchase consideration.

In *John Hancock Mutual Life Insurance Co.* v. *Bennett* (Tex. Com. App., 1939), 128 S. W. (2d) 791, a father conveyed property by separate deeds to each of his seven children, with a proviso in each deed for the payment to him by each grantee of $200 annually. It was held, in the light of the facts there present, that the conveyances constituted gifts rather than sales for an onerous consideration, as the intention of the grantor was to divide his property equitably among his children during his lifetime. The facts in the case before us are even stronger for holding that the annual payment to Ida Caldwell McFaddin was not an onerous consideration equivalent to a purchase consideration than were the facts in the *John Hancock* case, in that there the obligation to make the payment was personal. Here the payments were to be made only for the duration of the trust, or until her death, whichever first occurred, and only out of trust income or corpus. "Gift" and "onerous consideration" are exact antitheses. The idea of their coexistence involves a paradox. *Kearse* v. *Kearse* (Tex. Com. App., 1925), 276 S. W. 690, 693.

The trust beneficiaries were the children of settlor W. P. H. McFaddin and the natural objects of his bounty. He was naturally interested in their welfare and transferred to the trust whatever interest grantors had therein for the children's benefit, taking care in so doing to impose no obligation on them beyond the property transferred. Under these circumstances it can not be said that the indebtedness of the settlors or the amount payable to Ida Caldwell McFaddin con-

stituted consideration for the transfers to the trust to the extent of making what would otherwise be a gift a purchase by the trust for a valuable consideration.

Gifts in trust are gifts to the beneficiaries of beneficial interests in the trust corpus, the distributable income from which is taxable to the beneficiaries, *Irwin* v. *Gavit*, 268 U. S. 161, and such interests are separate property under Texas law, *Commissioner* v. *Wilson, supra; Commissioner* v. *Terry*, 69 Fed (2d) 969.

We do not agree that this interest, although separate originally, became community property because of the alleged commingling by the trustees of separate and community property and income. We are not convinced by the evidence that there was such a hopeless commingling of separate and community interests as to require that the entire interest be treated as community under Texas law, cf. *W. D. Johnson, supra; John Hancock Mutual Life Insurance Co.* v. *Bennett* (Tex. Civ. App., 1942), 159 S. W. (2d) 892; *Taylor* v. *Suloch Oil Co.* (Tex. Civ. App., 1940), 141 S. W. (2d) 657.

Furthermore, in Texas separate property retains its status as such so long as it can be traced, *Scofield* v. *Weiss* (C. C. A., 5th Cir., 1942), 131 Fed. (2d) 631; *W. D. Johnson, supra; Stephens* v. *Stephens, supra;* irrespective of enhancement in value; otherwise a specific piece of property would be constantly in the process of shifting from separate to community, and its status would be in constant confusion. Cf. *Scofield* v. *Weiss, supra; Beals* v. *Fontenot* (C. C. A., 5th Cir., 1940), 111 Fed. (2d) 956. Also, we are unable to say that any of the funds utilized by the trustees to pay off indebtedness outstanding against the original trust estate. which payment, it is contended, gave rise to a commingling of separate and community funds, were to any extent community property. Under the terms of the trust instrument gross income was treated as corpus and the rights of the beneficiaries therein did not attach to gross income but only to the distributable "net income" as defined therein, which is gross income less all operating expenses and additions to the corpus. Therefore, gross income so used was not community income and petitioners' contention that community income was used to pay off trust indebtedness and to acquire additional corpus is without merit.[3]

---

[3] Paragraph 6 of the trust instrument authorizes the trustees to set aside out of the income of the trust such amounts as they deem necessary for the purpose of accumulating reserves to pay off trust indebtedness, depreciation, obsolescence, and depletion. These funds may be used from time to time by the trustees in the same manner as any other funds of the trust estate without reference to the source of such funds. The income arising therefrom is to be treated as any other trust income. The intention is apparent from the provision that any portion of the trust income so set aside and utilized shall be considered to be part of the corpus. The corpus is effectively protected from being diluted with community income by the last part of paragraph 8 of the instrument, which, although permitting a. retention by the trustees of some of the distributive net income, upon election of the beneficiaries, requires that the fund so established and the property purchased therewith be kept separate from the trust estate, and the income from such special fund distributed separately.

The petitioners also argue that property subsequently purchased by the trustees became community property because some of it was acquired upon credit and because the money paid therefor was derived from commingled separate and community funds. The latter portion of this argument we have disposed of previously in holding that none of the funds utilized by the trustees were community property of any of the beneficiaries. The first part of the argument is invalid also, because under the Texas law if the down payment is from separate funds and the intention is clear to bind only the separate estate for future payments, the property so acquired is separate property, *Welsh* v. *Pottorff* (Tex. Civ. App., 1935), 87 S. W. (2d) 287; *Baxter* v. *Baxter* (Tex. Civ. App., 1920), 225 S. W. 204. This rule clearly applies to the situation presented here. The down payment for property subsequently acquired by the trustees upon credit was from funds which we have held to be separate property; the credit pledged was that of the trust estate,[4] in which petitioners' interests were also their separate property. The properties so purchased are therefore separate property.

Our conclusion is that the interests of petitioners in the entire trust estate which gave rise to the income here in controversy were their separate property.

The question remains whether the portions of petitioners' respective distributive shares of the "net income" of the trust which were attributable to royalties and to the sale of trust assets were properly treated by the Commissioner as separate income.

It is well settled in Texas that the proceeds of the sale of separate property are separate income. *Commissioner* v. *Skaggs* (C. C. A., 5th Cir., 1941), 122 Fed. (2d) 721; certiorari denied, 315 U. S. 811; *Stephens* v. *Stephens, supra.* In Texas oil and mineral royalties are considered to be proceeds of the sale of realty, and if derived from separate property they are separate income, *Commissioner* v. *Wilson, supra; Chesson* v. *Commissioner* (C. C. A., 5th Cir., 1932), 57 Fed. (2d) 141; *W. D. Johnson, supra; Dolores Crabb*, 47 B. T. A. 916; *Mellie Esperson Stewart*, 35 B. T. A. 406; *Stephens* v. *Stephens, supra.*

No evidence was submitted by the petitioners to show what were the general expenses or what portions thereof were attributable to the production of either community income or separate income or to the production of gross income not distributable under the trust instrument. We, therefore, approve the Commissioner's determination in the community property issue involved.

Petitioners in Docket Nos. 107896, 108082, and 108084 contend that the attorney fees paid for the recovery of overpayments of their income tax were ordinary and necessary business expenses, deductible under section 23 (a) (1) of the Revenue Act of 1938, or ordinary and

See section 14 of the declaration of trust.

necessary expenses paid for the production or collection of income deductible under section 23 (a) (2) of the Revenue Act of 1938, as amended by section 121 of the Revenue Act of 1942.[5]

In *Commissioner* v. *Burnett* (C. C. A., 5th Cir., 1941), 118 Fed. (2d) 659, it was held that attorney fees paid by a taxpayer for services in connection with obtaining a refund of personal income taxes arising out of an adjustment of distributable income of an estate of which she was a beneficiary, and to the trustees of which she acted as consultant, were personal expenses and not deductible as ordinary and necessary business expenses. The same is true in regard to the attorney fees here involved.

The overpayments were not income to petitioners when received. The fees paid for the recovery of the overpayments in tax were therefore not ordinary and necessary expenses paid or incurred during the taxable years for the production or collection of income, nor were they expenditures made by the petitioners for the management, conservation, or maintenance of property held for the production of income, as the trustees were the custodians of the property and such obligation did not rest on petitioners. The interest, however, was income to petitioners when received. To the extent therefore that these attorney fees were paid or incurred for the collection of the interest, they were paid or incurred for the production or collection of income and are deductible under section 23 (a) (2) as nontrade or nonbusiness expenses. Regulations 103, sec. 19.23 (a)–15, as amended. (See C. B. 1942–2, p. 96.) In our findings of fact, we have set forth the amount of refunds including interest received by each of the three petitioners involved in this issue and the amount of interest received and the fee paid by each. The attorney fees paid by each of these petitioners should be apportioned pro rata between the amount received by each as overpayments of the tax and the amounts received as interest thereon.

*Decisions will be entered under Rule 50.*

---

[5] As amended, section 23 (a) (2) of the Revenue Act of 1938 permits the deduction of nontrade or nonbusiness expenses, as follows :

"In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income."

Treasury Decision 5196, approved December 8, 1942, C. B. 1942–2, p. 96, provides :

"* * * Expenditures incurred * * * for the purpose of recovering taxes (other than recoveries required to be included in income), or for the purpose of resisting a proposed additional assessment of taxes (other than taxes on property held for the production of income) are not deductible expenses under this section, except that part thereof which the taxpayer clearly shows to be properly allocable to the recovery of interest required to be included in income."