J. O. Chapman v. Commissioner. Nancy J. Chapman v. Commissioner.
Chapman v. Commissioner
Docket Nos. 540,541, 1366, 1367.
United States Tax Court
1944 Tax Ct. Memo LEXIS 242; 3 T.C.M. (CCH) 604; T.C.M. (RIA) 44173; May 20, 1944
*242 In 1929, petitioners purchased considerable property known as the "Port Avenue Property" on the outskirts of a city in order to get a stip of land which they dedicated to the State in return for the State's paving a highway to petitioners' ranch south of the city. This was the controlling motive for petitioners' purchase of the land. Some of this land was already subdivided into lots at the time of the purchase and some of it was in large unsubdivided tracts. Up until the end of 1938 petitioners had sold only a small portion of the remaining undedicated land in four isolated transactions. During the taxable years 1939 and 1940, petitioners subdivided a portion of the unsubdivided tracts and resubdivided a portion of a subdivision and made numerous sales from all parcels of the remaining undedicated land. Held, during the taxable years all of the lots situated in the two subdivisions which petitioners plotted and placed on the market were held by petitioners primarily for sale to customers in the ordinary course of their business of selling real estate and could not therefore be included in the term "capital assets" as defined in section 117(a)(1) of the Internal Revenue Code. *243 Held, further, that the remainder of the Port Avenue property which petitioners purchased in 1929, and which they had continued to hold and had not subdivided or improved, constituted capital assets within the meaning of section 117(a)(1), I.R.C., and the gain from the sale of this part of the Port Avenue property in the taxable years is taxable at capital gain rates. Leon O. Lewis, Jr., C.P.A., 1709 Smith Young Tower, San Antonio, Tex., for the petitioners. Loyal E. Keir, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion These proceedings, duly consolidated, involve income tax deficiencies determined against petitioners for the calendar years 1939 and 1940 in amounts as follows: Docket
Petitioner
No.
Year
Deficiency
J. O. Chapman
540
1939
$ 822.57
Nancy J. Chapman
541
1939
822.57
J. O. Chapman
1367
1940
3,426.30
Nancy J. Chapman
1366
1940
3,426.30
The above deficiencies result from several adjustments to the net income as reported by petitioners, some of which are contested by appropriate assignments of error and some of which are not contested. In a statement attached to the deficiency notice of each petitioner for the *244 year 1939 the respondent explained the contested adjustment for that year in identical language as follows: (b) In your return for 1939 you reported as community income the sum of $15,291.86, representing capital gains realized from sales of real estate located in the vicinity of Port Avenue, Corpus Christi, Texas. It has been determined that the properties were held primarily for sale to customers in the ordinary course of trade or business, within the meaning of section 117(a)(1) of the Internal Revenue Code; that the adjusted costs of properties sold are $26,314.96; and that the profits realized from the sale thereof are ordinary income taxable in the year 1939 in the amount of $33,719.76. The adjustment is shown as follows: Gross sales price, per re-
turn
$60,608.07
Add: Increased sale price,
Lot 36, Block 5, Steele
Addition
1,600.00
Sales price, as corrected
$62,208.07
Less: Adjusted cost of lots
sold, as computed by you
$26,314.96
Sales expense allocated
1,722.57
Expense not allocated.
450.78
28,488.31
Gain on sales of lots, held
to constitute ordinary in-
come
$33,719.76
Amount reported as com-
munity income
15,291.86
Total adjustment
$18,427.90
Your one-half
$ 9,213.95
*245 In a statement attached to the deficiency notice of each petitioner for the year 1940 the respondent explained the contested adjustments for that year in identical language as follows: (a) and (b) In your return for 1940 you reported as community income the sum of $15,653.67, representing capital gains realized from sales of real estate located in the vicinity of Port Avenue, Corpus Christi, Texas. It has been determined that the properties were held primarily for sale to customers in the ordinary course of trade or business, within the meaning of section 117(a)(1) of the Internal Revenue Code; that the adjusted costs of properties sold are $19,787.47; and that the profits realized from the sale thereof are ordinary income taxable in the year 1940 in the amount of $32,981.73. The assignments of error are the same in all four proceedings except for the appropriate name, year and amount. The errors assigned in paragraph 4 of the petition in Docket No. 540 are as follows: (a) The Commissioner erred in determining that community income of petitioner and his wife, Nancy J. Chapman, in the amount of $33,719.76, representing gain on the sales of real estate, was ordinary income and in *246 refusing to allow petitioner the benefits of Section 117 of the Internal Revenue Code, relating to gains from the sale of capital assets. (b) In the event the court determines that the profit from the sales of real estate mentioned in paragraph 4(a) constituted ordinary income to petitioner and his wife, Nancy J. Chapman, then and in that event the Commissioner erred in failing to allocate to the cost of the real estate sold a proper portion of the cost of tracts dedicated to a state highway by petitioner and his wife, Nancy J. Chapman, in 1929. In his brief the "Respondent concedes that if the profit derived from the sale of certain real estate is taxable as ordinary income, the cost of lots or tracts dedicated to a State highway should be allocated to the cost of the remaining real estate in question." The parties have filed a stipulation of facts in which they agree upon all the facts necessary to a proper determination of these proceedings, except the one question as to whether the properties which were sold by petitioners during the taxable years 1939 and 1940 respresented "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or *247 business" as that phrase is used in section 117(a)(1) of the Internal Revenue Code. As to this question oral and documentary evidence were received. Findings of Fact Petitioners are husband and wife, residing at Chapman Ranch, and San Antonio, Texas. They filed their returns for the taxable years 1939 and 1940 on a community basis with the Collector for the First District of Texas. Since 1925 petitioner J. O. Chapman has been engaged in the business of farming and ranching, both on his own account and as manager for other members of the Chapman family owning an interest in the Chapman Ranch. The ranch, located about 17 miles south of Corpus Christi, Texas, contains approximately 34,000 acres of land. Petitioners' interest in Chapman Ranch consists of title in fee simple to 7,040 acres of land and title in fee simple to a one-third undivided interest in 6,400 acres of land. Chapman Ranch was devoted almost entirely to the production of cotton until recent years, during which years a portion of the ranch was utilized for livestock raising and the production of feed. Petitioners' principal occupation is farming and ranching, but in addition thereto petitioners individually owned and *248 operated a mercantile business and a poultry farm during the entire period since 1925. During this period petitioners owned all of the capital stock of Chapman Motor Company, Chapman Gin Company, and Chapman Power & Light Company, all three companies being corporations of which petitioner, J. O. Chapman, was president and general manager. Petitioner J. O. Chapman also owned one percent of the stock in Chapman Lumber Company, a corporation with its headquarters in Corpus Christi, and his mother owned about 97 percent of the stock of this company. The principal customers of petitioners' mercantile business and the three first-mentioned corporations were the Chapman Ranch, and the tenants and employees living thereon. During 1940 petitioners received dividends from Chapman Gin Company in the amount of $50,000 and dividends from Chapman Motor Company in the amount of $20,000. The headquarters of the Chapman Ranch is located on land owned exclusively by petitioners, and petitioners' investment in the improvements at the ranch headquarters, including the mercantile business and the three first-mentioned corporations there located, amounted to something over $400,000. This $400,000 investment *249 was owned by petitioners to the exclusion of other members of the Chapman family who owned an interest in Chapman Ranch. Prior to 1929 petitioners did not purchase any real estate except some farm and grass land in Hughes County, Oklahoma, about 1907 to 1913, a fifty-three acre farm in Nueces County, Texas, about 1929, and a residence in Waxahachie, Texas. Prior to 1929, petitioners did not sell any real estate except for one or two pieces of real estate in Hughes County, Oklahoma, sold prior to 1916, and a residence in Waxahachie, Texas. About ten percent of all the cotton grown in Nueces County was raised on the Chapman Ranch, and sometimes Nueces County was leading the entire state in cotton production. It was petitioners' job to get the crops to market and haul supplies to the ranch, and prior to 1929 the roads were often impassable. Petitioners needed a highway from Corpus Christi very badly. Petitioners could not get a highway built by the county because there was local opposition to a Chapman Ranch Highway. Petitioners started to grade a road from Chapman Ranch to Corpus Christi on the county right-of-way at their own expense, but were stopped by the county from continuing *250 the project, chiefly because of drainage problems. Just prior to 1929 a state highway known as the "Hug-the Coast" highway had been proposed to go from Orange to Brownsville. By 1929 the highway had been financed from Houston to Corpus Christi. Chapman became interested in having the highway designated from Corpus Christi to Chapman Ranch. The advantage in having the highway designated a state highway was that if it were so designated, the state would pay a substantial part of the cost of construction and would maintain the highway. After the State Highway Commissioner had inspected the proposed route, the Chairman of the Commission asked petitioner Chapman if he could acquire the right-of-way out of Corpus Christi and donate it to the State. The Division Engineer was definite in his recommendation that the Port Avenue right-of-way be obtained. The Port Avenue route was the most practical route for the highway, and it is doubtful that the state highway designation from Corpus Christi could have been obtained if it had not gone down the Port Avenue Road. Petitioners needed a highway to their ranch and other properties situated adjacent thereto and thought that the only way it could *251 be obtained was to furnish the right-of-way, without cost to the state, through the outskirts of Corpus Christi. During the year 1929 petitioners purchased unimproved subdivided town lots and non-subdivided acreage along the proposed route of the highway from the intersection of Port Avenue and Agnes Street, southward along what is now Port Avenue, through certain then existing subdivisions adjacent to the City of Corpus Christi, extending a distance of approximately one mile, and costing petitioners about $99,315.44. The principal reason petitioners purchased this property, sometimes referred to herein as the Port Avenue property, was to furnish the highway right-of-way through the outskirts of Corpus Christi, and thereby obtain a highway to their ranch. In the purchase of the Port Avenue property, petitioners did not openly purchase the land but it was bought by other persons and title taken in the names of the other persons so that the true purpose of the purchasers would not be known. Such other persons did not receive any compensation from petitioners. In the purchase of the Port Avenue property, petititioners purchased more land than was actually needed for the highway right-of-way *252 because if they had attempted to buy only a strip of land for the highway the purpose of petitioners would have been disclosed to the public. There was opposition to the highway project, and petitioners did not want the people in the area to know what they were doing until the right-of-way had been obtained. In the purchase of the Port Avenue property, petitioners hoped that the surplus property not needed for the highway could later be disposed of at a price approximating what they had paid for it. The Port Avenue property is shown in yellow in petitioners' exhibit No. 15, and consisted of the following: Cost of Portion
Number of lots
Total Orig-
Dedicated to
Name of Parcel
or square feet
inal Cost
Highway
Steele Addition
47 lots
$17,312.00
$ 2,758.70
Villa Green Addition
56 lots
26,700.00
5,314.00
Montrose Park Addition
14 lots
6,900.00
1,490.15
Mussett Tract
1,435,283 sf
26,400.00
1,569.82
Hoffman Tract
399,403.22 sf
5,250.00
854.40
Corpus Christi Heights
66 lots
16,753.44
1,272.52
Totals
$99,315.44
$13,259.59
Petitioners purchased three additional lots in 1938 and 1940, being Lots 21 and 22, in Block 5, Corpus Christi Heights, *253 purchased in 1938, and Lot 7, in Block 3, Corpus Christi Heights, purchased in 1940. Petitioners also purchased 640 acres adjoining the Chapman Ranch. Except for the real estate mentioned in this paragraph and in the immediately preceding paragraph above, petitioners purchased no real estate during the period from 1929 to 1940, inclusive. During the period from 1929 to 1938, inclusive, petitioners sold only the following portions of the above-mentioned real estate: (a) In 1930 petitioners sold out of the Mussett Tract to the Highway Department, a parcel of land 371 feet long and 290 feet wide. situated on the corner of Morgan Avenue and Port Avenue, on the west side of Port Avenue. (b) In 1934 petitioners sold out of the Mussett Tract to Humble Oil Company, a parcel of land 200 feet long and 150 feet wide, situated on the east side of Port Avenue and fronting 200 feet on Port Avenue. (c) In 1934 petitioners sold out of the Mussett Tract to Allen & Morris, a parcel of land 371 feet long and 120 feet wide, situated on the west side of Port Avenue, fronting 120 feet on Port Avenue. (d) On November 28, 1938, petitioners sold thirteen lots, being Lots 40 to 52, inclusive, Block 5, *254 in Steele Addition, to Frank Davis. Except for the sales referred to in the immediately preceding paragraph above, and the sales of a one-third interest in some land in Navarro County, Texas, petitioners sold no real estate during the years 1929 to 1938, inclusive and except for the sales of the Port Avenue property involved in this proceeding, petitioners sold no real estate in 1939 and 1940. All of the real estate purchased by petitioners in Steele Addition, Villa Green Addition, and Montrose Park Addition had been subdivided into lots before it was acquired by petitioners, and petitioners did not at any time subdivide, re-subdivide, or improve the property in those additions except that they dedicated certain portions of each subdivision to the State highway. All of the real estate purchased by petitioners in the Corpus Christi Heights Addition had been subdivided into lots before it was acquired by petitioners, and petitioners dedicated certain portions of the lots to the State highway. During the latter part of 1940, all except fourteen of the then remaining lots in Corpus Christi Heights were incorporated into Roosevelt Place, hereinafter referred to, a re-subdivision of portions *255 of what were formerly Corpus Christi Heights and the Hoffman Tract. After purchasing the Port Avenue property, petitioners dedicated to the State of Texas for highway purposes, a strip of land 100 feet wide, extending through all of the tracts so purchased. The location of the strip so dedicated is shown by two paranel red lines on petitioners' Exhibit 15. The petitioners did not receive any compensation for the dedication. The cost to petitioners of the land dedicated was $13,259.59. After the dedication was made by petitioners, a concrete highway was buit from Corpus Christi to Chapman Ranch headquarters, about fourteen miles from the city limits of Corpus Christi. The highway constructed on the land dedicated by petitioners was of material benefit to the remaining lots owned by petitioners in the Port Avenue Property. After selling the two portions of the Mussett Tract acreage fronting on the west side of Port Avenue (the 371 X 290 tract and the 371 X 120 tract mentioned above), petitioners on or about September 1, 1939, subdivided a portion of the Mussett Tract into 171 lots, creating La Paloma Addition. The portion of the Mussett Tract so subdivided was an area of 542,751.45 *256 square feet on the west end of the Mussett Tract, being west of Port Avenue a distance of 371 feet at the closest point. The location of the portion so subdivided is outlined in green pencil on petitioners' Exhibit 15. The subdividing of La Paloma was performed pursuant to Chapman's authorization, under his full knowledge and acquiescence. The reason a portion of the Mussett Tract was subdivided into La Paloma Addition was that it could not be sold at that time, and it was subdivided for the purpose of getting it in condition so it could be sold. La Paloma Addition was composed of small lots for sale to Mexicans on which to build small houses. Petitioners expended the sum of $230.78 in connection with the subdivision. On or about September 1, 1940, petitioners created a new subdivision out of that portion of the Hoffman Tract, bordering on the east side of Port Avenue and all of the then remaining lots in Corpus Christi Heights lying east of Port Avenue. This new subdivision, containing 75 lots, was called Roosevelt Place, and only one lot, having a cost of $327.50, was sold in 1940. The creation of the new Roosevelt Place Addition was handled by Trenton Cole, manager of the Chapman *257 Lumber Company of Corpus Christi, pursuant to Chapman's authorization, and under his full knowledge, and Chapman acquiesced in the final plan for the subdivision after several sets of plans had been rejected by the city planning board of Corpus Christi. Under the rules of the city planning board of Corpus Christi, petitioners were required to sell the entire Hoffman Tract and the then remaining lots in Corpus Christi Heights Addition or else lay out a subdivision plan that would meet with the development and expansion plans of the city. The city was then growing rapidly, due principally to oil developments and the establishment of a naval base. The Roosevelt Place Addition was dedicated in order to fit the other streets of the city and dovetail with the over-all plan of the city, and on August 29, 1940, petitioners entered into an agreement with certain other individuals for the restriction of property in this addition. Another reason for establishment of the new addition was to enable petitioners to begin selling lots in that vicinity and get their money out of them. Petitioners expended the sum of $5,897.43 in the improvement of Roosevelt Place. The management and sale of the *258 Port Avenue property was entrusted to Cole, for which services he received no compensation other than his salary as manager of the Chapman Lumber Co. Chapman was also president of this company. The selling of certain portions of the Port Avenue property made business for the Chapman Lumber Company, for in many cases purchasers of lots from petitioners bought lumber from the company in order to erect buildings on such lots. Sales not effected by Cole were made principally by real estate agents who were paid commissions. Chapman approved all sales and executed the deeds of conveyance. Chapman is not a licensed real estate dealer, did not maintain a real estate office, and did not personally procure any purchasers for any of the property here involved. Chapman did not run any newspaper advertisements, although there may have been some "For Sale" signs placed on the property. Due to the economic depression there were a few sales of this Port Avenue property during the years 1928 to 1938, inclusive, though there was not a time petitioners would not have sold it if they had been able to get their money out of the property. By 1939, however, the growth of Corpus Christi extended closer to *259 the property due to oil development in the area and the location of the Naval Training Station there. During the year 1939, petitioners sold 63 subdivided lots, embraced in 39 separate transactions, for a total consideration of $49,720.55; 16 partial lots, in four transactions, for an aggregate sales price of $2,465.70; two unsubdivided tracts for a total sales price of $8,500; and five frame dwellings for a total consideration of $1,521.82. In 1940, petitioners sold 154 lots in 44 transactions, for a total consideration of $52,692.74, and seven frame dwellings for an aggregate sales price of $2,182.91. Petitioners reported the gains from all of such sales in both taxable years as capital gains derived from the sale of capital assets. The respondent determined such gains to be ordinary income. In his determination of the gains from the sales of real estate, the respondent did not allocate to the cost of real estate sold any part of the cost of the land dedicated by petitioners to the State highway. Ten of the above lots sold during 1939 out of the Steele and Villa Green Additions were made to Oliver Bird. Ninety-three of the lots sold during 1940 out of the La Paloma Addition were *260 sold to J. A. Kozar. Four of the lots sold during 1940 out of the Villa Green Addition were sold to O. C. Easter. Bird, Kozar, and Easter were each engaged in the real estate business. If none of the cost of the land dedicated to the State highway should be allocated to the cost of real estate, sold then the net community gain of petitioners from the sales of real estate involved in this proceeding is as follows: Sales to
Individual
Real Estate
CALENDAR YEAR 1939
Sales
Dealers
Total
Gains from Sales of Property not Subdivided
by Petitioners: Steele Addition
$ 5,159.78)
Villa Green Addition
10,131.85)
$ 8,158.63
$23,450.26
Mussett Tract
6,581.95
6,581.95
Hoffman Tract
251.14
251.14
Corpus Christi Heights
476.02
476.02
Total Gains from Sales of Property not Sub-
divided by Petitioners
$22,600.74
$ 8,158.63
$30,759.37
Gains from Sales of Property Subdivided by
Petitioners: La Paloma Addition
2,960.39
2,960.39
Total Gains from Sales of Property Involved
in this Proceeding - 1939
$25,561.13
$ 8,158.63
$33,719.76
CALENDAR YEAR 1940
Gains from Sales of Property not Subdivided
by Petitioners: Steele Addition
$ 3,439.74
$ 3,439.74
Villa Green Addition
7,806.58
$ 2,779.18
10,585.76
Montrose Park Addition
5,205.92
5,205.92
Corpus Christi Heights Addition
536.77
536.77
Total Gains from Sales of Property not Sub-
divided by Petitioners
$16,989.01
$ 2,779.18
$19,768.19
Gains from Sales of Property Subdivided by
Petitioners: La Paloma Addition
$ 5,243.67
$ 7,500.37
$12,744.04
Roosevelt Place
469.50
469.50
Total Gains from Sales of Property Subdivided
by Petitioners
$ 5,713.17
$ 7,500.37
$13,213.54
Total Gains from Sales of Property Involved
in this Proceeding - 1940
$22,702.18
$10,279.55
$32,981.73
*261 If the cost of the land dedicated to the State highway by petitioners should be allocated to the property involved in this proceeding owned by petitioners after the dedication, then the net community gain of petitioners from the sales of real estate involved in this proceeding is as follows: Sales to
Individual
Real Estate
CALENDAR YEAR 1939
Sales
Dealers
Total
Gains from Sales of Property not Subdivided
by Petitioners: Steele Addition
$ 4,410.86)
Villa Green Addition
6,429.79)
$ 7,478.11
$18,318.76
Mussett Tract
6,564.51
6,564.51
Hoffman Tract
9.46
9.46
Corpus Christi Heights
434.28
434.28
Total Gains from Sales of Property not Sub-
divided by Petitioners
$17,848.90
$ 7,478.11
$25,327.01
Gains from Sales of Property Subdivided by
Petitioners: La Paloma Addition
2,909.42
2,909.42
Total Gains from Sales of Property Involved
in this Proceeding - 1939
$20,758.32
$ 7,478.11
$28,236.43
CALENDAR YEAR 1940
Gains from Sales of Property not Subdivided
by Petitioners: Steele Addition
$ 2,724.95
$ 2,724.95
Villa Green Addition
6,997.34
$ 2,513.74
9,511.08
Montrose Park Addition
4,782.20
4,782.20
Corpus Christi Heights
534.86
534.86
Total Gains from Sales of Property not Sub-
divided by Petitioners
$15,039.35
$ 2,513.74
$17,553.09
Gains from Sales of Property Subdivided by
Petitioners: La Paloma Addition
$ 5,161.04
$ 7,161.23
$12,322.27
Roosevelt Place
469.50
469.50
Total Gains from Sales of Property Subdivided
by Petitioners
$ 5,630.54
$ 7,161.23
$12,791.77
Total Gains from Sales of Property Involved
in this Proceeding - 1940
$20,669.89
$ 9,674.97
$30,344.86
*262 Petitioners handled their own financing. They made some sales, principally in the La Paloma Addition, under contract, retaining title until the full sales price was received. In those instances the purchasers made a down payment and the balance was liquidated in installments extending over a period of about five years. Other lots were sold for cash, and still others for part cash and part otherwise. Each of the other members of the Chapman Ranch enterprise owned more than 8,800 acres of land, consisting of both cultivated and uncultivated property. The cultivated portions were worth approximately $100 per acre, and the uncultivated about $40 per acre. By virtue of their interests, these other members would have derived a benefit from a paved highway linking Chapman Ranch with the City of Corpus Christi. Notwithstanding such a possible benefit they did not join in the highway project. Petitioners reported their income upon the cash receipts and disbursements basis. During the taxable years in question petitioners were engaged in the business of selling real estate to the extent they sold lots out of La Paloma Addition and Roosevelt Place, both of which subdivisions were laid out *263 by petitioners and placed on sale by them. The lots situated in said two subdivisions were held by petitioners primarily for sale to customers in the ordinary course of that business. This is also true of the two lots acquired by petitioners in 1938 and of the one lot acquired by them in 1940. Opinion BLACK, Judge: The ques ion in these proceedings is whether the agreed-upon gain from the sales of certain portions of the Port Avenue property during the taxable years 1939 and 1940 is taxable as capital gain as contended for by petitioners or as ordinary income as determined by the respondent. In order for the gain to be taxed as capital gain it is a statutory prerequisite that the property which petitioners sold be classified as "capital assets" as that term is defined in section 117(a)(1) of the Internal Revenue Code, the material provisions. The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *. If during the taxable years petitioners were engaged in the business of selling *264 real estate, and if the portions of the Port Avenue property which were sold during those years were held by petitioners primarily for sale to customers in the ordinary course of that business then the gain derived from the sales is taxable as ordinary income and not as capital gain. Snell v. Commissioner, 97 Fed. (2d) 891. Petitioners contend, first, that they were not in the business of selling real estate, that the primary purpose of purchasing the Port Avenue property was to obtain a strip of land 100 feet wide and a mile long on the outskirts of the City of Corpus Christi which they could dedicate to the State in return for the State paying a highway to Chapman Ranch, which was about 17 miles south of the City; and that in so doing they had no intention of engaging in the real estate business. We are satisfied from the proof that petitioners originally acquired the Port Avenue property primarily for the purpose of obtaining a paved highway to Chapman Ranch and not primarily for resale to customers in the ordinary course of any trade or business. It seems well established by the evidence that when petitioner J. O. Chapman acquired the property *265 in pursuance of his plan to get a paved highway to Chapman Ranch, he was not at all certain that he would make a profit out of the investment. He was advised by his banker that he might have to take a loss. But in determining whether property was "held" primarily for sale it is not controlling that when purchased it was not purchased primarily for the purpose of resale. What happens later may fix that purpose. Richards v. Commissioner, 81 Fed. (2d) 369. Petitioners rely principally upon Phipps et al. v. Commissioner, 54 Fed. (2d) 469; Pope et al. v. Commissioner, 77 Fed. (2d) 599; Croker v. Helvering, 91 Fed. (2d) 299; Higgins v. Commissioner, 312 U.S. 212; Thompson Lumber Company, 43 B.T.A. 726; United States v. Robinson, 129 Fed. (2d) 297; and Leonhard Felix Fuld, 44 B.T.A. 1268, affd. 139 Fed. (2d) 465. We think these authorities support petitioners' contention in so far as the sales in the taxable *266 years involve the Port Avenue property which was not subdivided by petitioners after they acquired it. In the Fuld case the taxpayers, who were brother and sister, had prior to October 9, 1930, purchased securities primarily for long term investment. On October 9, 1930, they entered a business of buying and selling securities and were so engaged during the taxable years 1933 and 1934. During the taxable years they sold some of the securities that had been purchased prior to October 9, 1930, and based upon the fact that such securities "were not themselves available for or used in the speculative business in which the taxpayers became engaged" it was held that such securities continued to be held as capital assets up until the date of sale. This we think is a comparable situation to the sale by petitioners in the taxable year of that part of the Port Avenue property which they had acquired in 1929 but which it is stipulated they did not "at any time subdivide, resubdivide, or improve except that they dedicated certain portions of such property to the state highway." As to this part of the Port Avenue property which petitioners sold in the taxable years the evidence is to the *267 effect that for several years after petitioners purchased the property there was a depression in Corpus Christi real estate and petitioners were unable to sell the property. By 1939 and 1940 demand for real estate in Corpus Christi had considerably improved and petitioners found the opportunity to sell some of the property at prices which they considered satisfactory. They established no real estate office either on the property or elsewhere. They did not advertise it for sale in the newspapers. They simply sold some of it in the taxable years through real estate agents at prices which they considered satisfactory. This we think as to this particular part of the Port Avenue property brings the case within the rule of the Fuld case. Cf. Carroll v. Commissioner, 70 Fed. (2d) 806; United States v. Robinson, supra.
But as to that part of the Port Avenue property which petitioners themselves subdivided and placed on the market as La Paloma Addition and Roosevelt Place, we hold differently. As to these su divisions petitioners went into the real estate business and the lots in these subdivisions were held primarily for sale *268 to customers in the course of petitioners' business. Richards v. Commissioner, supra;Welch v. Solomon, 99 Fed. (2d) 41; Ehrman v. Commissioner, 120 Fed. (2d) 607; James Lewis Caldwell McFaddin, 2 T.C. 395, 404 405; and C. W. Oliver v. Commissioner, 138 Fed. (2d) 910. We, therefore, sustain the respondent's determination that during the taxable years in question petitioners as to this part of the Port Avenue property were engaged in the business of selling real estate. It has also been stipulated that petitioners purchased three additional lots in 1938 and 1940 being lots 21 and 22 in Block 5, Corpus Christi Heights Addition purchased in 1938, and Lot 7, in Block 3, Corpus Christi Heights Addition purchased in 1940. These lots were not acquired in connection with the highway project detailed in our findings of fact, and no explanation is given as to why they were acquired. If these three lots or either of them were sold in 1939 and 1940 we hold that the gain therefrom is taxable as ordinary income along with the gains from sales *269 of lots in La Paloma Addition and Roosevelt Place. In determining the amount of the gain from the sales made during the taxable years the respondent did not allocate to the cost of the real estate sold any part of the cost of the land dedicated by petitioners to the State highway. He now concedes that this was error. The parties are in agreement as to how this allocation should be made and effect will be given to that agreement under Rule 50. Decisions will be entered under Rule 50.