Lizzie May Jackson v. Commissioner.
Jackson v. Commissioner
Docket No. 3114.
United States Tax Court
1946 Tax Ct. Memo LEXIS 222; 5 T.C.M. (CCH) 271; T.C.M. (RIA) 46086; April 9, 1946
*222 Held that certain real estate sold in the taxable years was held by petitioner primarily for sale in the ordinary course of her business. W. W. Spaulding, Esq., Tower Bldg., Washington, D.C., for the petitioner. Frank M. Thompson, Jr., Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion The deficiencies involved in this proceeding, in the amounts of $43.82 and $978.58 for the calendar years 1940 and 1941, respectively, result from several adjustments of petitioner's reported income tax liability, as made in the respondent's determination for each of those years. All of such adjustments are not in controversy. The sole issue, as to both years, is whether certain real estate lots sold by petitioner in 1940 and 1941 *223 constituted "capital assets", as reported by petitioner, or, constituted "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business", within the meaning of section 117 (a)(1) of the Internal Revenue Code. Findings of Fact The petitioner is a resident of Fort Walton, Florida, and for the calendar years 1940 and 1941 she filed her income tax returns with the collector for the district of Florida. During the taxable years and for several years prior thereto petitioner owned and operated the Hotel Miramar, Fort Walton, Florida, at which she also resided. Petitioner has a Florida hotel operator's license. Petitioner's various duties in managing all matters pertaining to the operation of the hotel constitute her principal occupation and require the greater portion of her time. Prior to World War II, Fort Walton was a fishing camp and summer resort, with numerous cottages in the area, which attracted a large summer population, and petitioner then operated the hotel as a resort hotel, but during the war Fort Walton became a defense area and the hotel was operated as a commercial hotel. Fort Walton is approximately *224 40 miles from Pensacola, Florida, and 33 miles from Crestview, Florida. On February 26, 1934, petitioner acquired title to 512 acres of land located at Fort Walton, having over 10,000 foot frontage on Santa Rosa Sound. At that time she held two past due notes, in the amount of $15,000 each, of the W. H. Harbinson Lumber Company, which was on the verge of bankruptcy. The company offered the acreage in payment of the notes and petitioner accepted because she feared that otherwise she might not collect anything on them. Subsequent to petitioner's acquisition of the above mentioned acreage, State Road No. 10 to Panama City, Florida was constructed through it thereby dividing the property into two tracts. One tract comprised about 412 acres on the north side of the road. The other tract comprised about 100 acres in the shape of a long narrow strip of land, varying in depth from 150 feet to 660 feet between the road and the Santa Rosa Sound, and was "just" deep enough to have the 104 lots hereinafter mentioned laid out. The petitioner has never attempted to sell and has never received any offer to buy either of the two tracts as acreage. A Miss Bacon offered to buy a small parcel of *225 the property between the road and the Sound as a site for a hotel. However, petitioner could not deliver a deed or an abstract of title to such parcel without first having it surveyed and platted. On advice of her attorney and in order to enable her to more readily make future sales of portions of the water front property and to avoid the difficulty of securing a survey of each parcel as it was sold, the petitioner had the 100 acre water front tract surveyed and subdivided into 104 lots, each of which was staked out and most of which were about 100 feet in width. She had a plat or map of the subdivision, which was named Seabreeze, duly recorded at Crestview, Florida, in June 1935; had abstracts of title made; and had deeds prepared so that at any time and with little difficulty she could transfer title to any lots she happened to sell. From the time the water front tract was subdivided and up to and including the year 1941, the petitioner has not made any improvement on the property; has not put up "for sale" signs; has not listed the lots with any real estate agent; has not applied for or secured a real estate agent's license; has no real estate office; and has not held herself *226 out to the public as being in the real estate business. People in the area of Fort Walton knew that petitioner owned the lots and persons who wanted lots came to her and if a sale was made petitioner executed and delivered the deed, together with an abstract of title. Petitioner sold ten lots in 1935 for $9,150; four lots in 1936 for $3,595; three lots in 1937 for $3,500; two and two-fifths lots in 1938 for $3,125; five lots in 1939 for $4,550; one lot in 1940 for $1,800; and seven lots to one person in 1941 for $7,000. During those years petitioner has not subdivided any other property, has not bought any real property for resale, and has not handled any real property or rents for anyone else. In addition to the Hotel Miramar and the above mentioned acreage and lots in Fort Walton, Florida, and during all or some portion of the period from 1935 to 1941, the petitioner owned the following properties which she either operated or leased: a house in Gulf Hills, Mississippi, which was rented 1935-1941; the Bellevue Apartments and Bellevue Lodge at Hendersonville, North Carolina, which were operated until sold in 1939; the Fort Walton Coca Cola Storage Building, which was rented 1939-1941; *227 and the Fort Walton Sinclair Filling Station, which was rented 1940-1941. In her tax return for 1935 and in connection with reporting the sale of the lots in the Seabreeze Subdivision, the petitioner listed as part of the cost of the lots in that subdivision three-fourths of $2,052.75 or $1,539.56, as the amount expended in 1935 for "surveying, attorney fees, and abstracts". In reporting in her tax returns net gains from the sales of the lots in the subdivision in 1935, petitioner took the following deductions as expenses of the sales, "Commission on Lots Sold $800 * * * Sign Post $42 * * * Calls, Gas, etc. $26.39"; and in reporting in her tax returns for 1936 and 1937 net gains from the sales of lots in the subdivision in those years, petitioner, in each year, took the following deductions as expenses of the sales: "Commissions" on sales of lots $300; and in 1936 she also took the following additional deductions: "Phone, Gas and Oil $18.51 * * * Miscellaneous Expense $5.00". The so-called "commissions" to the extent of $300 in each of the years 1935, 1936, and 1937 were not paid to real estate agents for the sale of lots, but instead constituted amounts paid to petitioner's brother *228 and her son to protect the property from fires caused by persons who burned off the nearby woods to provide grazing land for cattle. In her return for 1940 petitioner reported: the sale of one lot for $1,800; the cost thereof as $255; the gross capital gain therefrom as $1,545; and the net taxable long term capital gain therefrom as $772.50. In her return for 1941 petitioner reported: the sale of seven lots for $7,000; the cost thereof as $1,475; the deductible expenses as $343.40; the gross capital gain therefrom as $5,181.60; and the net taxable long term capital gain therefrom as $2,590.80. In determining the deficiencies in controversy the respondent included the entire amount of the gain of $1,545 for 1940 and of $5,181.60 for 1941 in petitioner's taxable income for each of those years, respectively, on the ground that the sales of the lots were not sales of capital assets. Opinion TYSON, Judge: The sole issue as to both years is whether the respondent erred in determining that the real estate lots sold by petitioner in 1940 and 1941 were not "capital assets" as reported by petitioner, but instead constituted "property held * * * primarily for sale to customers in the ordinary *229 course of * * * [her real estate] trade or business", within the meaning of section 117 (a) of the Internal Revenue Code. [1] There is no question as to the amount of gain recognized. In 1934 the petitioner acquired 512 acres of land which, because of the threatened bankruptcy of the debtor, petitioner accepted in satisfaction of an indebtedness to her. After her acquisition of the acreage a public highway was constructed, dividing the property and leaving 100 acres thereof between the highway *230 and Santa Rosa Sound. The 100 acres consisted of a strip of land "just" deep enough to have lots laid off each fronting approximately 100 feet on the highway and extending to the Sound. In 1935 and after the construction of the highway, petitioner, in order to more readily sell the 100 acres, had it surveyed and subdivided into 104 lots, staked these lots off, and recorded in the public records a plat or map of such subdivision. In creating this subdivision petitioner incurred, as shown by her income tax return for 1935, expenses of $1,539.56 for surveying, attorneys fees, and abstracts. After the creation of the subdivision, petitioner sold lots therein during the years 1935 to 1941, inclusive, as shown in our findings of fact. It may be noted that in her income tax returns for 1935 and 1936 petitioner deducted, as expenses of sales, items for phone calls, gas, etc., and in her return for 1935 she also deducted $800 for "commissions on lots sold". $300 of the item so designated as "commissions on lots sold" in 1935 was paid by petitioner to her son and brother for protecting the property. In view of the facts and circumstances, as shown by the record, we are of the opinion that *231 the petitioner operated a real estate business, making sales of lots with continuity and not casually during the taxable years, as well as in prior years, and that the property involved was held by her primarily for sale to her customers in the ordinary course of her business. While there is no inflexible rule as to just what constitutes trade or business and each case must be decided on its own facts, Sam J. Reckford, 40 B.T.A. 900, we think that the following authorities support our conclusion. Ehrman v. Commissioner, 120 Fed. (2d) 607, Richards v. Commissioner, 81 Fed. (2d) 369 143 Fed. (2d) 468; Snell v. Commissioner, 97 Fed. (2d) 891; Oliver v. Commissioner, 138 Fed. (2d) 910; Neils Schultz, 44 B.T.A. 146; and James Lewis Caldwell McFaddin, 2 T.C. 395. In some, but not all of the cited cases, the taxpayers constructed streets through the subdivision involved and in some, but not all of the cases the taxpayers provided for gas, water, and electricity, while here, petitioner did none of those things. We think, however, that under the facts and circumstances here, little, if any, importance *232 is to be attached to these differences since here the construction of the public highway was the only street frontage needed for the lots, and the record fails to show whether water, gas, or electricity was available for installation in the subdivision. The fact that petitioner's principal occupation was that of owner and licensed operator of the Hotel Miramar, which required the greater portion of her time, would not preclude her from also engaging in the real estate business, contra to petitioner's contention, for a taxpayer's "business" within the statutes need not be his sole occupation nor require all of his time and attention. Snell v. Commissioner, supra and Oliver v. Commissioner, supra. Furthermore, also contra to another contention of petitioner, the manner in which she acquired the property in question and the fact that it was not at the time acquired for resale, is not determinative of the issue presented. Ehrman v. Commissioner, supra; Brown v. Commissioner, supra; Richards v. Commissioner, supra. The determination of the respondent with respect to the gains derived by the petitioner from her sales of the property *233 involved is approved. Decision will be entered for the respondent. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other preperty of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1);↩