LUCILLE McGAH, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 20772, 20773, 20774, 20775. Promulgated July 31, 1950.

---

[1] These proceedings were consolidated for trial and opinion: Lucille McGah, Docket No. 20772; E. W. McGah, Docket No. 20773; Carole O'Shea, Docket No. 20774; and John P. O'Shea, Docket No. 20775.

*M. W. Dobrzensky, Esq.*, for the petitioners.
*Charles W. Nyquist, Esq.*, for the respondent.

OPINION.

HARRON, *Judge:* The question in this proceeding is whether the gain from the sales of 14 houses in 1944 by the partnership, San Leandro, is taxable as ordinary income or as capital gain. The respondent has determined that the 14 houses were held for sale to customers in the ordinary course of trade or business within the meaning of sections 117 (a) and (j) of the Internal Revenue Code and that, consequently, the gain from the sales of the 14 dwelling units during the taxable year is taxable as ordinary income. The petitioners contend, on the other hand, that the 14 houses were held primarily for rental and that they were not held primarily for sale to customers in the ordinary course of San Leandro's business, and that the gains, therefore, are taxable as capital gains. The petitioners rely upon *Nelson A. Farry,* 13 T. C. 8, and upon other cases which have been decided by this Court. Consideration has been given to all of the cases which have been cited.

The issue involved is one of fact, and the burden is on the petitioners to show that the properties in question were not held primarily for sale to customers in the ordinary course of trade or business. *Greene* v. *Commissioner,* 141 Fed. (2d) 645, certiorari denied, 323 U. S. 717; *Commissioner* v. *Boeing,* 106 Fed. (2d) 305, certiorari denied, 308 U. S. 619.

Although the petitioners E. W. McGah and John P. O'Shea are individuals, the issue relates to them only as members of the partnership, San Leandro Homes Co., and the issue to be decided involves one question, among others, as to what the business of San Leandro was in 1944, which is a fact question. The evidence shows that San Leandro was engaged in the business of constructing small houses, that the capital contributed by the two partners was small, only $13,-500, and that San Leandro obtained "100 per cent loans," under F. H. A. regulations from Central Bank to finance the purchase of lots and the construction of 169 houses. The record lacks facts about the terms of the loans, but shows that about $676,000 (169 × $4,000), at least, was borrowed, and that the "life" of the houses, for purposes of depreciation, was a little more than 16 years. Since ceilings were placed by housing authorities upon the rent which could be charged

for the houses, that fact must be taken into consideration along with the large indebtedness of San Leandro. An obvious question is how San Leandro expected to pay the loans obtained to build the houses, and how long would it take to work out the project from the viewpoint of the financing which was adopted. San Leandro was created with a very small amount of working capital. Against this background, the petitioners have made the contention that San Leandro's primary purpose was to build houses for investment purposes—to make its earnings and profits from the rental of 169 small defense workers' houses. Petitioners place strong emphasis upon the purpose of San Leandro at the time it filed with O. P. M. an application for preference ratings for construction materials, which was in August of 1942.

Assuming for purposes of argument only that two of the contentions of the petitioners are sound and are supported by the evidence, namely, that when the houses were completed in about February of 1943, its purpose was to hold 95 houses for investment purposes, to be rented and thereby to produce income in accordance with an investment purpose, and that a valid differentiation is to be made between San Leandro's purpose with respect to one group of 74 houses and another group of the remaining 95 houses, (and we question the soundness of this contention), the question is narrowed to whether 95 houses were held primarily for rental and investment purposes in the fiscal year of the partnership ending on October 31, 1944, which is the taxable year, or whether the houses were held primarily for sale to customers in the ordinary course of the business of San Leandro. Since 14 houses were sold in the taxable year, it may be proper to narrow the question further to the question stated above as it applies to only 14 houses. We consider the question in both aspects. Since the question is a question of fact, it is better first to discuss the evidence which is pertinent to the above question.

The petitioners knew when the 169 houses were completed, at the latest, which was in February of 1942, what each cost, what the interest and mortgage carrying charges were for each house, and what the ceilings on rents were. Although they contend that San Leandro went into the project of constructing 169 defense workers' houses as an investment rather than with a purpose of selling the houses, they admit that before any houses were rented, it was decided that 74 should be sold. The original purpose was changed, therefore, in about February or March of 1943 with respect to 74 houses, at least. During the trial of these proceedings, McGah admitted that he knew in February or March of 1943, that San Leandro was privileged to sell any or all of the houses, in so far as regulations of the housing authorities were concerned, and O'Shea testified that he and his partner did not know, at the time they applied for priorities ratings, in

1942, how long San Leandro would be in "the business," and that it was impossible to guess. O'Shea testified also, that in the middle of 1944, Central Bank did more than "suggest" that houses should be sold in the then favorable market. He testified as follows: "I think the bank's remarks were a little more than a suggestion. It wasn't actually in the form of a suggestion. It was in the form more or less of a demand."

· The evidence shows that from August of 1944 until October 31, 1947, 60 houses (out of 95) were sold. In 1944, 14 were sold in three months between August 1st and October 31st. The sales were continuous and frequent during that period. The record fails to disclose the dates of sales during the three subsequent years, but the number of sales in the succeeding year, 31, indicates that those sales were continuous and frequent.

The evidence shows, also, that San Leandro, at some time subsequent to the conference with officers of Central Bank in the middle of 1944, obtained a further loan from the bank with which it financed the building of more houses, which, for the most part, were sold, only a few of those houses being retained.

Upon all of the evidence, it must be concluded that at some time prior to August 1, 1944, the members of the partnership, San Leandro Homes Co., changed their alleged original purpose with respect to the 95 houses held by the partnership from the purpose of holding them primarily to rent, for investment purposes, to holding them primarily for sale and to selling houses as they became vacant. None of the houses were leased. All were rented under a month-to-month arrangement which was made orally. It is concluded, also, that the evidence does not support the theory of the petitioners.

The general issue which is involved here has been before courts frequently. There are several tests which are to be applied to determine whether property is held primarily for investment purposes, or primarily for sale to customers in the ordinary course of business. We need not restate them, but refer to the extensive review of authorities in *Boomhower* v. *United States*, 74 Fed. Supp. 997 (D. C., N. D. Iowa, Dec. 23, 1947). One test of whether property is held primarily for investment purposes is lack of continuity of sales, either because of inactivity or infrequency of sales, so that sales which take place have the aspect of isolated transactions. That test, applied to the facts of these proceedings fails, according to our understanding of the evidence in these proceedings. Furthermore, the contention that the 95 houses constituted investment properties in 1944, prior to the sales of 14 houses, is not convincing, in the light of the record. The Central Bank was not disposed to carry San Leandro for any extended period of time, according to the record before us. About one year after the project was completed, it demanded faster liquidation of the

original loan or loans, after 74 houses had been sold in 1943. And the partners, themselves, had no fixed purpose in 1944 of renting the properties for a long period of time, or of holding them for investment purposes, according to the testimony of one of the partners. How long they would "be in the business" was a matter of conjecture to them.

It has been held that an original status of property is not determinative of the question of whether it was, at the time of its sale, held for investment purposes or for sale to customers. See *Carl Marks & Co.*, 12 T. C. 1196, 1202, where this Court said that the "crucial factor to consider in determining the character of" the property in question is the purpose for which it was held during the period in question, i. e., in the taxable year. See, also, *Richards* v. *Commissioner*, 81 Fed. (2d) 369, affirming 30 B. T. A. 1131, and *Oliver* v. *Commissioner*, 138 Fed. (2d) 910. The question becomes concerned with whether an original purpose of holding property changed, and if so, when.

The fact that the houses were rented prior to sales does not establish that at the time of sale they were held primarily for investment to produce income. See *Neils Schultz*, 44 B. T. A. 146; *Charles H. Black, Sr.*, 45 B. T. A. 204, and *Walter G. Morley*, 8 T. C. 904. In these proceedings, a decision had been made at some time prior to August 1, 1944, to sell houses as they became vacant, and this decision was carried out in 1944, and in succeeding years. The original purpose to rent houses had changed prior to the time sales were made.

The development of a tract of lots by building houses thereon requires capital. Ordinarily, where the primary purpose is for the investment of capital and the holding of property to produce income and for investment purposes, there is expectation of carrying on the venture for some longer period of time than is the case where gain is to be realized from a comparatively rapid turnover of capital. The petitioners assert that San Leandro, in the taxable year, was engaged in an investment operation. But the record shows that San Leandro lacked any substantial capital of its own, and it is a fact that it had borrowed practically all of the capital required to purchase the lots and build the houses. The evidence shows, also, that the annual net income from rental receipts was small in view of the large amount of San Leandro's indebtedness to the bank. The situation was such, as we construe the evidence in the record before us, that realization of any substantial gain depended upon making sales of the houses. And in the middle of 1944, the bank pressed San Leandro to sell its properties. We think the reasonable conclusion to be drawn from the evidence is that San Leandro was in the business of selling houses in 1944. It is concluded that San Leandro was in the business of selling houses in 1944 within the meaning of sections 117 (a) and (j) of the Code. See *Delsing* v. *United States*, U. S. D. C., N. D., Texas, decided March 23, 1950; *Larson* v. *Korth*, 92 Fed. Supp. 705; *Ehrman* v. *Commis-*

*sioner*, 120 Fed. (2d) 607, certiorari denied, 314 U. S. 668; and *James Lewis Caldwell McFaddin*, 2 T. C. 395, modified on another point, 148 Fed. (2d) 570. Cf. *McDaniel* v. *United States*, U. S. D. C., N. D., Texas, decided March 23, 1950.

Petitioners rely upon *Nelson A. Farry, supra*, but the facts in that case showed clearly that property was held for investment purposes. That case is distinguishable from these proceedings upon the facts. In the *Nelson A. Farry* case, the taxpayer had made investments in rental properties over a period of several years. Other than some stock in a small local company, he had no other investments than his rental properties. From 1934 until 1940, he acquired or built 38 duplex apartments and negro rental houses. At the end of 1941, he had increased his holdings to 45 different rental properties, comprising about 100 rental units. In the *Farry* case, the taxable years involved were 1944 and 1945. It was not until 1944 that the taxpayer considered selling any of his properties. In 1944 and 1945, he sold 46 parcels of property. We found the following facts: "It was pointed out to petitioner by his banker that interest on the notes which he could take in the sale of these rental properties would yield more than rents from the property. Petitioner concurred in this view," (p. 11). The facts were, in the *Farry* case, that the taxpayer had gradually accumulated rental properties for purposes of investment during a period of seven years, and had held various parcels as investment properties during periods of from four to ten years, respectively. This Court concluded that the petitioner had

\* \* \* proved by overwhelming evidence that he purchased and held the rental properties primarily for investment purposes. The fact that in the taxable years he received satisfactory offers for some of them and sold them does not establish that he was holding them "primarily for sale to customers in the ordinary course of his trade or business." The evidence shows that he was holding them for investment purposes and not for sale as a dealer in real estate.

In the instant proceedings, we are unable to conclude that the petitioners have proved that San Leandro was holding 95 houses in 1944, prior to the sales of 14 houses, primarily for investment purposes. The record indicates that in the middle of 1944, San Leandro desired to build more houses and approached Central Bank for a loan for that purpose. It was then indebted to the bank for over $350,-000. The houses were a little over one year old. About one year and a half after the group of 95 houses were built, San Leandro began selling the houses in this group of 95 which the petitioners ask us to consider as a distinct group, separate and apart from the 74 houses which it sold in 1943. There is nothing in the record to indicate that the market for the sale of houses was more favorable in 1944 than it had been in 1943, so that the decision in 1944, prior to August 1st, to sell houses was not predicated upon a change in market conditions

as compared with prior years as was the situation in the *Farry* case. And here, there is no convincing evidence that the purpose of San Leandro was to build houses primarly for investment purposes and that sales of houses were merely incident to carrying out that purpose, as was concluded in the *Farry* case. It appears in these proceedings that the business of San Leandro was building houses, that sales thereof were part of that business, and that it was only by selling houses than San Leandro could turn over its capital and build more houses. We consider the *Farry* case to be clearly distinguishable on the facts from these proceedings.

It is held that the 14 houses which San Leandro sold in its fiscal year ended October 31, 1944, constitued property held by San Leandro primarily for sale to customers in the ordinary course of its business, and that the gains realized from the sales of 14 houses are taxable as ordinary income. The respondent's determinations are sustained.

*Decisions will be entered for the respondent.*