Palm Homes, Inc. v. Commissioner.
Palm Homes, Inc. v. Commissioner
Docket No. 29884.
United States Tax Court
1952 Tax Ct. Memo LEXIS 352; 11 T.C.M. (CCH) 28; T.C.M. (RIA) 52008; January 17, 1952
*352 Houses built for war workers under government priorities found to be held primarily for sale to customers in the ordinary course of business. H. P. Forrest, Esq., and Charles A. Morehead, Esq., for the petitioner. Newman A. Townsend, Jr., Esq., and Thomas C. Cravens, Jr., Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This proceeding is brought for the redetermination of the following deficiencies in petitioner's income and excess profits taxes: Declared
Excess
Fiscal Year
Income
Value Excess
Profits
Ended
Tax
Profits Tax
Tax
Mar. 31, 1946
$3,879.53
$3,085.49
$8,309.09
Mar. 31, 1947
3,953.53
The issue presented is whether gains realized on sales of residential property were correctly determined by the respondent to be ordinary income rather than capital gains. Findings of Fact The petitioner is a Florida corporation incorporated on May 23, 1944, with its principal office in Miami, Florida. The tax returns for the taxable years in question were filed with the Collector of Internal Revenue for the District of Florida at Jacksonville. All of petitioner's capital stock, with the *353 exception of qualifying shares, was owned by the Lester Preu Corporation. The majority of the capital stock of the Lester Preu Corporation was owned by Lester Preu, president and director of the petitioner corporation. Lester Preu has been engaged primarily in the building and selling of houses since he began living in the Miami area. The Lester Preu Corporation was engaged in the construction of houses for sale and also during the years 1943 and 1944 in the construction of military installations. Builders in the Miami-Florida area had not engaged in extensive work during the years 1942 to 1944 because of the war-time priorities on building materials and were anxious to obtain priorities to build houses. All residential housing constructed during these years required priorities. Under the priority system in effect, the only houses that could be built were those approved by the National Housing Administration, hereinafter referred to as the N.H.A. The N.H.A. made surveys to determine the number of houses needed in a particular area to house war workers. It thereupon allocated the houses to be built to various builders and issued the necessary priorities. The Federal Housing Authority, *354 hereinafter referred to as the F.H.A., insured the loans negotiated by the builders to finance the cost of construction. This governmental program was designed to provide low-cost housing for war workers. The builder had to agree to rent or sell the houses to war workers for certain established ceilings. The houses could be sold to a war worker at a price not in excess of the ceiling price after he had occupied it for four months, or they could be sold to persons who would agree to make them available to war workers under the same conditions. Most builders in the Miami area operating under the N.H.A. program thought they could profitably sell at the ceiling price. However, some discovered they could not, and rented the houses until the ceilings were removed. In March, 1944, the N.H.A. programmed 1,050 houses to be built in the Miami area and during the period June, 1944 to April, 1945 allocated 100 houses to the petitioner. The petitioner undertook the building of only 96 houses and completed them by October. 1945. Part of the funds used to finance the building operation were borrowed from banks and insurance companies. The F.H.A. insured substantially all of these loans. *355 Most or all of the 96 houses cost the petitioner approximately $4,500 each, including the cost of the land. Forty-five of these houses were subject to a rental ceiling of $45 per month and a sales price ceiling of approximately $4,500. The sales price ceiling on the remaining 51 houses ranged from $5,175 to $5,625 each. When the petitioner undertook this building operation, it contemplated selling some of the houses as soon as they were completed in order that it would have funds to finance the construction of the others. Approximately one-third were sold immediately upon completion. The remaining two-thirds, which included the 31 in controversy, were rented prior to sale. The leases pursuant to which they were rented provided for month-to-month tenancies. The petitioner did not segregate or classify any of the 96 houses as being primarily for sale or primarily for rent. All of the 31 houses in controversy, with the exception of four sold in the taxable year 1946, were held for more than six months. *
In October, *356 1945, the occupancy and ceiling price restrictions were removed. The houses could be sold to anyone for any price they would bring. The rental ceilings, however, were not removed at that time. With the removal of the ceiling price restrictions on the houses being rented by the petitioner, it was possible to sell the houses at a price substantially in excess of their cost because of the scarcity of housing at that time. Because of this fact and the further fact that the low rental ceilings were still in effect, it became profitable to sell them. Twenty-nine of the 31 houses in controversy were sold during the period November, 1945 to March, 1946, and the remaining two were sold during the taxable year ending March 31, 1947. The 31 houses were sold for approximately $7,000 to $7,500 each. One furnished house was sold for $13,000. Beginning with the taxable year ended March 31, 1946, the taxable year in which the ceiling price restrictions were removed, the approximate sales by the petitioner were as follows: Taxable year ended March 31, 1946
56 houses
Taxable year ended March 31, 1947
12 houses
Taxable year ended March 31, 1948
21 houses
Total
89 Five houses *357 remained unsold at the time this proceeding was heard. Most or all of the 31 houses in controversy were sold to the tenants. The petitioner sent a letter to each tenant stating that the house he occupied would be sold at a certain sales price and that he as tenant would receive preference over other purchasers. The tenant was also given three months' notice to vacate if he did not purchase the property. The letter explained that it was no longer profitable to rent the property. No extensive sales program was necessary to sell the houses. Most of the tenants were anxious to purchase them. In addition to the 96 houses, the petitioner constructed and sold approximately 12 other houses in the taxable year 1947 and 21 housing units in the taxable year 1948. Ten of the latter were rented for approximately five months before being sold. The petitioner concedes that the gain on all of these houses, with the exception of the 31 in controversy, constituted ordinary income and not capital gain. The petitioner built and held the 31 houses in controversy primarily for sale to customers in the ordinary course of its business and not for investment purposes. Opinion ARUNDELL, Judge: *358 The issue before us is whether 31 of the 96 houses built by the petitioner and sold during the taxable years 1946 and 1947 were held primarily for sale to customers in the ordinary course of business. This is primarily a question of fact. King v. Commissioner, 189 Fed. (2d) 122; Rubino v. Commissioner, 186 Fed. (2d) 304. The respondent determined they were and taxed the gain on their sale as ordinary income. See section 117 (j), I.R.C.
The well recognized tests for determining whether or not property was held primarily for sale to customers in the ordinary course of business have been summarized in Dunlap v. Oldham Lumber Co., 178 Fed. (2d) 781, 783; Boomhower v. United States, 74 Fed. Supp. 997; and Albert Winnick, 17 T.C. - (Sept. 28, 1951). The stated tests are: continuity of sales and sales related activity over a period of time; frequency of sales, as opposed to isolated transactions; the activity of the seller or those acting under his instructions or in his behalf; the extent or substantiality of the transactions; and the reason for, the purpose, and the nature of the acquisition of the subject matter. *359 Application of these tests to the facts before us requires that the respondent's determination be sustained. Turning first to the last mentioned test, we think the record shows that the petitioner built the 96 houses for the purpose of sale. Lester Preu, the dominant shareholder of the Lester Preu Corporation (the corporation which held all of petitioner's capital stock except for qualifying shares) had been engaged in the building of houses for sale since coming to Miami, and the Lester Preu Corporation was similarly engaged since prior to the years in question. Lester Preu, like many other builders suffering from the war-time restrictions on building materials, decided to build houses for war workers under a governmental program which provided that the builder had to agree to rent the houses to the war workers if they did not desire to buy. The houses could be sold to war workers provided the conditions, as set forth in our findings, were met. This agreement to give the war worker the option to rent was not inconsistent with a purpose to sell. As pointed out in Rollingwood Corp. v. Commissioner, 190 Fed. (2d) 263, 266, a case involving the same type of agreement under *360 a similar governmental program for the housing of war workers, "It might well be that they contemplated that these agreements would furnish a ready buyer for the individual houses". It is noteworthy that most if not all of the houses which were rented prior to sale were sold to tenants. We think it is clear that the rental of the houses was a temporary, incidental activity pending the removal of the sales price ceiling. The petitioner, like other builders in the Miami area who constructed houses under this governmental program, realized that it could not sell the houses profitably at the ceiling price, and therefore temporarily rented some of them until the sales price ceiling was removed. However, the fact that the houses were temporarily rented does not compel the conclusion that they were held primarily for rental investment. In any event, we are convinced that during the taxable years in question they were no longer held for that purpose but instead were held primarily for sale. The purpose for which property is temporarily held does not stamp it with a permanently fixed and unalterable status any more than does the purpose for which it was originally acquired. Albert Winnick, *361 supra, Lucille McGah, 15 T.C. 69, Carl Marks & Co., 12 T.C. 1196, Richards v. Commissioner, 81 Fed. (2d) 369. Cf. Dunlap v. Oldham Lumber Co., supra.See Rollingwood Corp. v. Commissioner, supra, at page 266, wherein the court stated: "While the purpose for which the property was acquired is of some weight, the ultimate question is the purpose for which the property is held." There was a continuity of sales of the houses in question immediately following the removal of the sales price restrictions in October, 1945. Twenty-nine of the 31 houses were sold from November, 1945 to the close of the taxable year on March 31, 1946, and the remaining two were sold in the next taxable year. In fact, a total of approximately 56 houses, including these 29, were sold in the taxable year ended March 31, 1946; approximately 12 were sold the next taxable year, and approximately 21 in the taxable year ended March 31, 1948. The sales, including the sales of the 31 houses in question, were obviously frequent and extensive and clearly cannot be regarded as single, disconnected or isolated transactions. These facts indicate to us that *362 during the taxable years the houses in question were held primarily for sale to customers in the ordinary course of business. There is no evidence that the petitioner's selling activity with reference to the houses in question was any less than it was with reference to those which it does not deny were held primarily for sale. The tenants were anxious to purchase the houses, and needed only to be told that they were for sale. As we have previously stated, most if not all of the rental houses were sold to the tenants. In addition to these tests, there is the testimony of Lester Preu that with the removal of the ceiling price restrictions and the retention of the rent ceilings it was no longer profitable to rent the houses. Houses formerly subject to sales price ceilings of approximately $4,500 to $5,625 were sold for approximately $7,000 to $7,500. In what is apparently a form letter, written after the removal of the ceiling price restrictions and addressed to tenants, the petitioner explained that it was no longer profitable to rent the houses and, therefore, they would be sold. Finally, we must note that unlike the taxpayer in Delsing v. United States, 186 Fed. (2d) 59, *363 the petitioner did not segregate or classify any particular houses as being held primarily for sale or primarily for rental purposes. Although the petitioner from the beginning contemplated selling some of the houses immediately upon completion and in fact did sell approximately one-third immediately upon completion, Lester Preu did not know which it would sell and which it would hold for rental, and testified that "They were all held for investment * * *." For the reasons stated above, we are of the view that the 31 houses in controversy which were sold during the taxable years 1946 and 1947 were held primarily for sale to customers in the ordinary course of business and we find no error in the respondent's determination. Decision will be entered under Rule 50. Footnotes
*. The amount of gain on the houses is not in issue. The parties agreed at the hearing to use the respondent's determination of the gain in their Rule 50 computation.↩