F. R. McAbee, Incorporated v. Commissioner.
McAbee v. Commissioner
Docket No. 38983.
United States Tax Court
1953 Tax Ct. Memo LEXIS 224; 12 T.C.M. (CCH) 633; T.C.M. (RIA) 53195; June 4, 1953
*224 S. Harold Shefelman, Esq., 1612 Northern Life Tower, Seattle, Wash., for the petitioner. John H. Welch, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency of $19,399.03 in income tax of the petitioner for its fiscal year ended March 31, 1947. The question for decision is whether or not the Commissioner erred in treating the petitioner's gain on the sale of 72 homes during the taxable year as ordinary income rather than long-term capital gain under section 117 (j), Internal Revenue Code. Findings of Fact The petitioner, F. R. McAbee, Incorporated, was incorporated April 15, 1941, under the laws of Washington. Its corporate income tax returns were filed with the collector of internal revenue for the district of Washington. Among other things the corporate purposes of the petitioner were to purchase real estate; make and purchase materials for the construction of buildings; to erect, own, manage, lease, and sell buildings; to carry on the business of builders and contract for the purpose of building, etc. Except for the period from 1932 to 1938, F. R. McAbee *225 has been in the construction business from 1922 on, most of the time as a contractor. He invested $10,000 in the petitioner and owned all of its outstanding stock. The petitioner's first housing development was carried out in 1941. It consisted of 50 single-family dwellings which were financed through a mortgage company and sold. During the succeeding year another defense housing project in Seattle was carried out by F. R. McAbee through another corporation. This project comprised 69 houses which were financed and sold through another mortgage company. The third large project in which McAbee was interested is the one here in question carried on by the petitioner. It comprised 174 single-family units in Seattle constructed under War Production Board priorities. In applying for these priorities the petitioner stated it would not sell any of the houses except as authorized by General Orders 60-2 and 60-3, as then amended, of the National Housing Authority. These orders provided that the houses could be sold to eligible war workers who decided to buy after occupying a house for two months. In addition, sales could be made of one third of the houses to other eligible war workers within *226 15 days after the F.H.A. had issued its final priority compliance inspection report. Construction of the houses for the project in question was started in August or September 1943. The first houses were completed about seven weeks after work started and the rate of completion was three a week. The last of the houses was completed in the first part of 1945. All houses were rented upon completion with the exception of those sold. Rentals were handled by the petitioner and most of the houses were rented under a standard written lease. Most of the leases ran for a year, but some were for longer and some for shorter terms. The standard lease was entitled "Rental Agreement with Option to Purchase." The option provided that the "landlord agrees with the tenant that the tenant may purchase" for a stipulated sum and the tenant was given a credit on purchase price of $12 for each month's rent paid if the option was exercised within four months. The houses were built at a total cost of $858,639.52. Thirty-three houses were sold prior to April 1, 1945, and the remaining were sold as follows: Fiscal Year
Number of
Ended
Homes Sold
Net Gain
Average Gain
March 31, 1946
64
$ 48,866.90
$ 763.54
March 31, 1947
72
150,293.17
2,087.41
March 31, 1948
3
8,048.96
2,682.99
March 31, 1949
1
2,613.95
2,613.95
Totals
140
$209,822.98
*227 The monthly sales and gains, and the average gain per home sold during the taxable year ended March 31, 1947 were: Number
Average Net Gain
Month
Year
Sold
Net Gain
Per Home
April
1946
2
$ 1,820.86
$ 910.43
May
1946
4
5,813.31
1,453.33
June
1946
2
2,656.56
1,328.28
July
1946
4
6,648.60
1,662.15
August
1946
15
30,291.82
2,019.47
September
1946
15
32,506.26
2,167.08
October
1946
16
35,951.20
2,246.95
November
1946
6
15,172.45
2,528.74
December
1946
6
13,943.78
2,323.96
March
1947
2
5,488.33
2,744.17
Totals
72
$150,293.17
During the period from April 1, 1945 to March 31, 1947, the petitioner reported net income on its tax returns as follows: Year ended March 31, 1946
$ 5,644.47
Year ended March 31, 1947
$149,627.17
The net income included the total amount of the gains from the sale of 136 houses. All restrictions upon the number of houses that could be sold and the prices at which the houses could be sold were removed on October 15, 1945. The market for houses in Seattle was such that the petitioner could have sold houses more rapidly than it did both before and after *228 October 15, 1945. Toward the end of 1945, McAbee became interested in another housing project to be carried on by Alderbrook Development Company, a corporation in which he held a 50 per cent interest. Earnest money was paid on land for this project in December 1945 (by whom is not shown). He discussed financing with the mortgage company which had financed the project with which we are concerned in this case. The mortgage company thought McAbee was not in a liquid enough position and did not participate in the Alderbrook development. A bank loan was obtained to provide for the purchase price of the land. To whom the loan was made - to the petitioner, Alderbrook, or McAbee personally is not shown. The Alderbrook project was abandoned about June 1946 because needed building materials were not available. Before the abandonment, arrangements had been made with a bank for construction credit and a construction loan. In the prior development in which the petitioner was interested where the houses were admittedly held for sale, sales were made by the real estate department of the company which financed the development. In the development in question no agents were used and the houses were *229 sold by means of the options contained in the leases until about June of 1946, after which other methods were used with a resulting step-up in the rate of sales. In the years 1948 and 1950, subsequent to the period in question, McAbee was interested in several other developments involving the construction and rental of duplexes, apartment houses, and stores. Most of the units involved in these projects were still rented at the time of the hearing though some were sold to help finance the projects. There was no segregation of the houses in controversy on the accounts of the petitioner. Neither did the petitioner in any manner segregate the houses in the development in any way which would distinguish those purportedly held for investment from those held for sale in the ordinary course of business. The 72 houses here in controversy which were sold during the fiscal year ended March 31, 1947, were held primarily for sale to customers in the ordinary course of the petitioner's business from the time of their completion and on the respective dates of sale. Opinion The issue for decision is whether 72 of the 174 houses built by the petitioner in the period 1943 to 1945, many of *230 which had been rented, and which were sold during the fiscal year ended March 31, 1947, were held primarily for sale to customers in the ordinary course of business. This is essentially a factual question, Louis Rubino v. Commissioner, (C.A. 9), 186 Fed. (2d 304, affirming a Memorandum Opinion of this Court, and the parties so recognize. The Commissioner determined that they were and taxed the gain on their sale as ordinary income. The petitioner's position is that it entered upon the project embracing the 72 houses with the intent to hold for rental as many of the 174 houses built as possible, that it knew roughly one third to one half would have to be sold and the intent was that the remainder were to be held for investment. We do not think the record supports the petitioner. The accepted criteria for deciding whether or not property was held primarily for sale to customers in the ordinary course of business are continuity and frequency of sales, the activity of the seller, the extent of the transactions and the purpose and nature of the acquisition of the subject matter. Dunlap v. Oldham Lumber Co., 178 Fed. (2d 781; Rollingwood Corp. v. Commissioner, (C.A. 9), 190 Fed. (2d) 263, *231 affirming a Memorandum Opinion of this Court. Measured by these criteria the Commissioner's determination was correct. The petitioner was in the business, among other things, of building and selling buildings. Its first building project consisted of 50 singlefamily dwellings which concededly were built for sale. In the next year F. R. McAbee, the sole stockholder of the petitioner, engaged in another home building project through another corporation comprising 69 houses. These houses were also built for sale and were sold. Construction of houses in the project here under consideration was begun in the fall of 1943. The last of the houses was completed early in 1945. Federal regulations contained certain restrictions on the sale of these houses and required interim rental to war workers. Nevertheless, 33 of the dwellings had been sold by April 1, 1945, 64 more by April 1, 1946, 72 were sold in the following year and the 4 remaining by April 1, 1949. Federal restrictions on sales were lifted on October 15, 1945. Original rental of the houses sold does not militate against a finding that they were held primarily for sale in the ordinary course of business. Rollingwood Corp. v. Commissioner, supra; *232 Lucille McGah, 15 T.C. 69, remanded by the Court of Appeals of the Ninth Circuit for additional findings, 193 Fed. (2d) 662. That they were primarily so held is buttressed by the fact that the leases under which the houses were rented each contained a continuing offer to sell by the petitioner. The petitioner argues that this was merely a device for disposing of enough houses to insure funds for financing the project and that it is unreasonable to assume that all options would be exercised. The fact is, however, that the result was that all of the houses were thus offered for sale, that many of them were sold and that so far as the record shows, after all but 70 odd houses had been sold, the remainder could still have been subject to sale under the options. We cannot find that the houses which the petitioner urges that it intended to hold for investment were ever withdrawn from the market. A change in the method of sale occurred about June 1946 which resulted in sales at an increased rate beginning in August of that year. The petitioner argues that this is evidence of an intention to liquidate the houses that had theretofore been held for investment, and *233 that the change from a holding for investment to sales for liquidation was caused by the abandonment of the Alderbrook project and the need for cash with which to pay off a bank loan made to purchase land for that project. We cannot agree with this argument. We find no evidence that the petitioner was interested in the Alderbrook project which was being carried on by another corporation in which F. R. McAbee was a stockholder. True, McAbee was the sole owner of the stock in the petitioner, but there is no showing that any monies raised by the sale of the petitioner's houses went to pay off the bank loan. It seems more likely that the increased efforts to sell after June 1946 came about because the margin of profit per house was reaching attractive levels. This margin steadily increased from an average net gain per house of $1,328.28 in June 1946 to a margin of $2,744.17 in March 1947 with an interim falling off to $2,323.96 in December 1946. We have not overlooked the fact that the record does contain direct testimony by F. R. McAbee that the petitioner's intent was to hold the houses in controversy for investment. However, the more we study the record, the stronger becomes our feeling *234 that the oral testimony of the witness is far outweighed by the other evidence. Neither have we ignored the projects undertaken by McAbee and the corporations in which he was interested in years subsequent to those before us. Those projects involved duplexes, apartments and stores, all susceptible of different treatment from the war worker homes here under consideration. To us this case seems no stronger for the petitioner than the hypothetical situation posed by the Court in Rollingwood Corp. v. Commissioner, supra, at page 266: "Suppose the taxpayer in the instant case intended to rent the houses for as long as he was required to do so under existing regulations and then to sell them. Or suppose his intention was to pursue whichever of these activities proved to be the most profitable, that is, if the rental market were good he would continue to rent but if the sales market were high he would sell. In either of these suppositions we think it is fair to say that one of the essential purposes (in acquiring or holding the houses) is the purpose of sale. Under such circumstances, if the taxpayer does dispose of the houses by sale, is it within the legislative purpose *235 to allow him to treat the proceeds of these sales as a capital gain? We think not." After consideration of all the facts we hold that the 72 houses in question were held primarily for sale to customers in the ordinary course of business during the taxable year. Accordingly, the gains realized from their sales were ordinary income. Decision will be entered for the Respondent.