PARKSIDE, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent BEACONCREST, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Parkside, Inc. v. Commissioner
Docket Nos. 2885-71; 2886-71
United States Tax Court
T.C. Memo 1975-14; 1975 Tax Ct. Memo LEXIS 359; 34 T.C.M. (CCH) 54; T.C.M. (RIA) 750014; January 27, 1975, Filed Philip H. Long (an officer), for the petitioners. Robert T. Hollihan, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in the Federal income tax of petitioners Parkside, Inc. ("Parkside") and Beaconcrest, Inc. ("Beaconcrest") as follows: PARKSIDE, INC.
BEACONCREST, INC.
1966
$ 3,975.25
1967
10,615.65
9,260.77
1968
8,593.45
8,806.60
TOTAL
$23,184.35
$18,067.37 The two issues remaining for decision *362 are: (a) Whether petitioners are subject for the years in issue to the personal holding company tax imposed by section 541; [1] and (b) Whether in 1966, 1967 and 1968 all or any part of the compensation in excess of $1,800 per year paid by Beaconcrest to its president, Philip H. Long, constituted unreasonable compensation. FINDINGS OF FACT Some of the facts are stipulated and are accordingly found. Petitioners, Parkside, Inc. and Beaconcrest, Inc., are corporations organized and operating under the laws of the State of Washington. Each has its principal place of business in Bellevue, Washington. Petitioners filed their Federal income tax returns for the calendar years 1966 and 1967 with the district director of internal revenue, Tacoma, Washington. For 1968, returns were filed with the Internal Revenue Service Center, Ogden, Utah. Amended returns for all years in issue were filed by both petitioners with the Ogden Service Center. Both petitioners use the cash receipts and disbursements method of accounting. Since 1960 the stock of petitioners has been owned in equal *363 shares by three brothers and a sister, Philip H. Long, James Robert Long, Dwight Stanley Long, and Erma Long McKenzie ("shareholders"). The stock of Parkside was inherited by the shareholders from their father in 1960. Beaconcrest was formed on August 1, 1960 to receive part of the assets of Standard Homes, Inc., a corporation which had been organized by the shareholders' father to construct buildings for sale and/or rental and was owned by him at his death. Parkside's principal assets consisted of 26 duplex homes located in the Holman Road area of the City of Seattle. Beaconcrest's principal assets consisted of 21 duplexes located in the Beacon Hill area in the southern part of Seattle. In January 1960 Philip H. Long ("Long") left his job at Northwestern Mutual Insurance Company to become the president of each of the petitioners. He did not assume these roles eagerly, but did so only after extended discussions with his siblings and out of a sense of family responsibility. Long had little knowledge of his father's business prior to his father's death, although he was aware that his father had been experiencing serious financial difficulties. During the first months of his presidencies, *364 Long made an intensive study of the corporations. He concluded that on liquidation Parkside would bring no more than $50,000, while Beaconcrest could be sold for between $50,000 and $100,000. These sums he found unacceptable. After discussions with the other shareholders, Long decided to retain the properties and rent them rather than liquidate the corporations. In 1960 Long undertook to fill what he regarded as gaps in his commercial education relating to corporate operations. In 1960 he spent six months studying rental and commercial properties in Seattle. Starting in April 1961 Philip took a twelve week course in real estate mechanics and salesmanship. Moreover, during 1962 Long took the professional real estate appraisal course given at the University of Washington, which qualified him to become a professional appraiser. Because of the poor financial position of petitioners, Long was very cost-conscious, cutting expenses wherever possible. Nonetheless, expenses continued to exceed receipts. It was continually necessary for him to raise additional funds to meet the petitioners' operating costs and obligations. Between 1960 and 1964 Beaconcrest's expenses and mortgage payments *365 exceeded its total receipts by between $20,000 and $25,000 and Parkside's expenses and mortgage payments exceeded its total receipts by more than $40,000. These deficits were financed in part by shareholder loans. Long decided that the properties would have to be disposed of rather than held unprofitably for rental indefinitely. By 1964 Long had determined that since neither the duplexes as a block nor the stock of the corporations would bring an acceptable price, he would endeavor to sell the duplexes individually. In order to avoid foreclosures and other problems which Long knew had always plagued his father in selling duplexes, he devised a unique set of criteria for potential purchasers. Long specified that purchasers on real estate contracts must be blue-collar workers, capable of making all repairs and maintaining the properties themselves. They also had to demonstrate an ability to rent the units not personally used without having to hire an agent. Further, the purchasers must intend to continue to hold a full-time job which would provide their main source of income. Long required that purchasers have good credit ratings, a history of steady employment, and be long-time residents *366 of the area. On August 23, 1964, Long placed a large advertisement in the Sunday Seattle Times on behalf of Parkside, which stated that 26 duplexes were for sale by the owner. Subsequent to the publication of the ad, Long contacted all tenants of the duplexes in an effort to interest them in purchasing them. He also attempted to sell duplexes to those who responded to the ad. These efforts were unsuccessful. Long then decided to employ professional real estate agents. On October 26, 1964, he listed the Parkside duplexes with the real estate firm of Ewing & Clark, Inc. An exclusive thirty day listing was given which was periodically extended. Later, after Long grew dissatified with Ewing & Clark, he engaged Metzgers' Realty, Inc., to sell the remaining duplexes, also utilizing an exclusive listing arrangement. In July 1965 Long gave Central Realty a ninety-day exclusive listing of the duplexes owned by Beaconcrest. These efforts did not produce the desired results. Before May 1965 only two duplexes were sold, and these were sold for substantially less than the original asking price. Therefore, Long modified his requirements, lowering both the downpayment and the monthly payment *367 requirements. To compensate for both concessions, he raised the asking price of each duplex by $1,000 to $2,000. Downpayments were as low as $375 for a duplex selling for $16,000 to $19,000. Initially, monthly payments for the Parkside duplexes were set at no higher than $135; later this figure was lowered to $100. Long set $100 as the monthly payment for all Beaconcrest duplexes sold on credit. Cash sales, of course, were never refused. All duplexes owned by both petitioners were mortgaged. When a duplex was sold on an installment contract, the mortgage was not assumed by the purchaser but remained a liability of the seller-corporation. The monthly amounts that the contract purchasers were required to pay were fixed by the contract of sale and were not increased when real estate taxes increased. Petitioners agreed to assume the additional tax payments along with the obligations to insure against fire. However, amounts so paid were passed on to the purchasers by extending the number of fixed payments. As president of Parkside and Beaconcrest, Long set the price and terms of each sale. He prepared and furnished the real estate brokerage firms with maps of all lots. Because the original *368 platting on which the Beaconcrest duplexes had been built was not followed, the preparation of the maps of these lots was especially arduous. Each sale of a duplex involved negotiations with the prospective purchaser. Initial negotiations for the seller corporation were carried out by the salesmen. Thereafter, the procedure would vary; sometimes Long would then personally enter into the negotiations, other times he would not. Once a formal offer to purchase was made, the purchaser signed an earnest money agreement specifying the duplex, the price and the terms. Long then decided whether or not to accept the offer or to make a counter-offer. Whenever the sales contract called for credit to be extended, Long made extensive inquiries to determine whether the purchaser was a good credit risk and whether he met Long's specifications. Long had an informal arrangement with two banks to obtain Dun & Bradstreet as well as Seattle Credit Bureau ratings on prospective buyers. Also, he personally determined how long the party had resided at the same Seattle address by consulting old phone books and city directories, and contacted the prospective purchaser's employer to determine how long he *369 had held his job. Long also interviewed each prospective purchaser to determine his level of personal commitment to the successful discharge of the purchase contract. Even after an earnest money agreement had been signed and extensive negotiations had been undertaken by Long, often an ultimate agreement was not reached. The first sale of the 47 duplexes occurred in January 1965. Thereafter, sales continued until the last duplex was sold in October 1966. The following is a schedule of all sales: Park-
Beacon- Month and Year
side
crest
Total
January 1965
2
2
May 1965
1
1
June 1965
1
1
September 1965
1
1
October 1965
2
2
December 1965
4
4
January 1966
2
2
February 1966
1
1
2
March 1966
3
2
5
April 1966
1
9
10
May 1966
5
3
8
June 1966
3
1
4
July 1966
1
1
2
August 1966
1
1
October 1966
2
2
TOTAL
26
21
47 By November 1, 1966, all duplexes of both Parkside and Beaconcrest had been sold. There were no foreclosures of any of these pieces of property during 1967 and 1968. All sales were made through brokers and required the payment of commissions. Parkside paid brokerage commissions *370 of $27,327.00 for the sale of its 26 duplexes; Beaconcrest paid $21,321.90 for the sale of its 21 duplexes. In most instances the downpayment received by the corporations was not sufficient to cover closing costs and commissions. Where this was the case, the petitioners signed notes obligating themselves to pay off the brokers over a period of time. Long believed that because major efforts were put forth by the brokers these payments were well justified and reasonable. All gains from the sale of the duplexes were reported (on the installment basis) in the petitioners' original Federal income tax returns as gains from the sale of section 1231 assets. [2] This treatment was never challenged by respondent. During the years in issue the petitioners received the following income, designated as interest on their Federal income tax returns, relating to real estate *371 contracts for the duplexes sold during the years 1965 and 1966: 1966
1967
1968
Parkside
$17,406.15
$24,636.37
$24,253.69
Beaconcrest
13,784.67
12,865.98 Petitioners received no other personal holding company income during 1966, 1967 and 1968. In an effort to improve the cash flow position of the corporations, Long decided to take what he considered to be a minimal salary. The informal understanding among the shareholders was that Long would be better compensated once the corporations were in improved financial positions. During 1967 and 1968 the total compensation paid by Beaconcrest to Long was $7,300 and $7,200, respectively; [3] no salary was received from Parkside, which had a negative cash flow in 1967 and 1968. During these two years Long received no salary or compensation from any other sources. Allowing for a *372 15 percent fringe benefit factor, the prevailing yearly wage rates in 1968 for workers in the Seattle area in the following occupations were the following amounts: Occupation
Yearly Wage
guards and watchmen
$ 7,535
janitors, porters and
cleaners
7,056
helpers (maintenance
trades)
7,535
shipping clerks
8,396
truck drivers (city
delivery)
10,286 Fringe benefits such as health, life insurance and pension coverage were typically provided to workers in the Seattle area at an average additional cost to the employer of 15 to 25 percent of the wages paid. Because of the poor cash flow of the petitioners and the necessity of making mortgage payments, Long closely monitored receipts. Six days a week he went to the post office, five miles from his home, to collect the real estate contract payments. He found that only about 20 percent of the monthly payments from the contracts were received when due; some were four to five months late. Long felt it incumbent upon him to keep abreast of economic conditions in Seattle. He made friends with certain members of financial institutions. He also studied financial publications and statistics at the Seattle Public Library *373 and the University of Washington library, and studied the Wall Street Journal and Fortune Magazine, to both of which he subscribed. These activities took an average of not less than five to six hours per week. All mortgage payments by Beaconcrest and Parkside were made by Long personally. Moreover, because of the precarious liquidity position of the corporations, he felt it necessary to establish and maintain certain business relationships. Several times a month Long would visit the managers and mortgage officers at certain banks and mortgage companies. Long felt that these contacts would be helpful if either corporation ever needed a loan on short notice. Those individuals who bought duplexes from petitioners were not, as purchasing criteria specified by Long would imply, sophisticated in the realm of business. Because of this, to insure against defaults Long would occasionally speak with them and offer business suggestions. Furthermore, when problems arose, the purchasers would often contact Long for advice or help. One of Long's corporate responsibilities was to inform the other shareholders of the condition of the corporations. Generally he telephoned the other shareholders, *374 but occasionally he visited them in Oregon or California. Since June 1964, Long has personally kept the corporate books and records. From 1960 to June 1964, they were kept by a professional bookkeeper, Ruth Hayden, who was paid $200 per month plus an occasional Christmas bonus. Merging the bookkeeper's responsibilities into those of Long was an economy measure. To cut out-of-pocket operating expenses further, Long moved the petitioners' office into his own house in or about July of 1964. Previously, an office had been rented in an office building at a cost of $144 per month. Long has never charged the corporations any rent for the use of the space. Other than Long, only three people were ever employed by petitioners. From August 1960 through November 1966, Beaconcrest employed Ruth Jensen who showed the duplexes to perspective renters. From January 1960 through December 1966, Parkside employed H. C. Rowan who showed the duplexes for rental, collected the monthly rents, and did most routine maintenance work. As described above, Ruth Hayden was employed as bookkeeper. All employees were directly supervised by Long. OPINION 1. Personal holding company tax.
Respondent determined *375 that Parkside was a personal holding company (as defined in section 542[4]), subject to personal holding company tax (as provided in section 541[5]) upon its undistributed personal holding company income for the years 1966, 1967 and 1968. In addition, respondent determined that Beaconcrest was a personal holding company subject to the personal holding company tax for the years 1967 and 1968. *376 Petitioners Parkside and Beaconcrest contend that they were not personal holding companies in the years in issue. It has been stipulated that petitioners met the stock-ownership test of section 542(a) (2), inasmuch as the stock of each petitioner was owned equally by the four shareholders. But petitioners contend they did not meet the adjusted ordinary gross income requirement of section 542(a) (1). Resolution of this issue rests upon the question of whether the 47 duplexes sold by petitioners were held by them for sale to customers in the ordinary course of their trade or business. During the years in issue petitioners received income from real estate contracts for duplexes sold by them during 1965 and 1966, which income was designated as "interest" on their Federal income tax returns. Petitioners contend that under section 543(b) (3)[6] this interest is classified as "rents" for purposes of determining personal holding company status. Respondent agrees that if the interest is classified as "rents," petitioners are not personal holding companies. Under section 543(b) (3) the interest is "rents" only if the duplexes were held primarily for sale to customers in the ordinary course *377 of petitioners' trade or business. Whether petitioners are personal holding companies subject to personal holding company tax therefore depends on whether they were dealers in real estate during 1965 and 1966. Since this question turns on its individual and particular facts, prolonged comparison between the facts of this case and those of the many previously decided cases is not very helpful. The evaluation of petitioners' purpose in holding the duplexes cannot be limited to the time of sale, but must include consideration of the reasons for acquisition of the property and the purpose for holding it throughout the period from acquisition to sale. Municipal Bond *378 Corporation v. Commissioner,341 F. 2d 683, 689 (C.A. 8, 1965), reversing 41 T.C. 20 (1963). A dealer's intent to hold for sale must exist for some appreciable period before the actual sale; otherwise every sale would automatically fall into the dealer category. See McGah v. Commissioner,193 F. 2d 662 (C.A. 9, 1952), reversing 15 T.C. 69 (1950), on remand 17 T.C. 1458 (1952), reversed 210 F. 2d 769 (1954). Relying in the main on the following facts, we conclude in this case that petitioners did not hold the duplexes primarily for sale to customers in the ordinary course of their trade or business. 1. The shareholders' interest in the property was acquired by inheritance. The Parkside shareholders acquired their stock directly from their father's estate; Beaconcrest was formed by the same shareholders to receive other assets from the shareholders' father's estate. The property owned by both corporations consisted of duplexes built by the deceased father. The duplexes were rented by the corporations while the shareholders considered and determined the best way to deal with them. Continued *379 rental proved to be a losing proposition. It was determined impractical and disadvantageous to sell either the stock of the corporations or the duplexes as a block, and so Philip Long, as president of the corporations, embarked upon a program of selling the duplexes individually. The overall picture is that the shareholders fell heir to rented property, duplexes, through the mechanism of holding shares in petitioners, Parkside and Beaconcrest, and after a brief and unsuccessful try at renting them, liquidated the property in the most economical and advantageous manner. The liquidation continued some two years, for the properties were difficult to dispose of, but the dominant liquidation motive continued from start to finish. No new properties were acquired nor was it ever contemplated that after these 47 duplexes had been sold there would be any continuation of sales activities. Generally, such a picture is not that of a dealer in real estate. Mackall v. United States,162 F. Supp. 522 (E.D. Va., 1957); John Randolph Hopkins,15 T.C. 160 (1950). See Garrett v. United States,120 F. Supp. 193 (Ct. Cl., 1954). Even when it *380 is necessary to subdivide inherited property in order to sell it, the courts generally have found the taxpayer is not a dealer in real estate. Riedel v. Commissioner,261 F. 2d 371 (C.A. 5, 1958), reversing and remanding a Memorandum Opinion of this Court; Yunker v. Commissioner,256 F. 2d 130 (C.A. 6, 1958), reversing and remanding 26 T.C. 161 (1956); Camp v. Murray,226 F. 2d 931 (C.A. 4, 1955); Smith v. Dunn,224 F. 2d 353 (C.A. 5, 1955); Estate of William D. Mundy,36 T.C. 703 (1961). However, sufficient selling activities and large numbers of sales have in some cases been considered enough to turn a liquidation of inherited assets into the business of selling property. United States v. Winthrop,417 F. 2d 905 (C.A. 5, 1969). Such, in our judgment, is not the situation here. 2. The property was held for rent prior to sale. Liquidation of investment property again generally does not cause the seller to be a dealer in real estate. Curtis Company v. Commissioner,232 F. 2d 167 (C.A. 3, 1956), affirming in part, reversing *381 and remanding in part 23 T.C. 740 (1955); Ross v. Commissioner,227 F. 2d 265 (C.A. 5, 1955), reversing a Memorandum Opinion of this Court; Goldberg v. Commissioner,223 F. 2d 709 (C.A. 5, 1955), reversing and remanding 22 T.C. 533 (1954); Dillon v. Commissioner,213 F. 2d 218 (C.A. 8, 1954), reversing a Memorandum Opinion of this Court. On the other hand, where the taxpayer is carrying on an active sales campaign in liquidating rental property, it is possible to be a dealer even though original acquisition of the property was for rental purposes. Murray v. Commissioner,238 F. 2d 137 (C.A. 10, 1956), affirming a Memorandum Opinion of this Court; Pacific Homes, Inc. v. United States,230 F. 2d 755 (C.A. 9, 1956); Home Co. v. Commissioner,212 F. 2d 637 (C.A. 10, 1954), affirming a Memorandum Opinion of this Court. We do not find that Philip Long's sales activities or the volume of transactions are sufficient to make the petitioners dealers in real property. It is noteworthy that sales were carried on through real estate agents *382 rather than by employees of petitioners. See Dillon v. Commissioner,supra.
3. The liquidation here was accomplished by piecemeal sales rather than a sale of the entire stock of the corporations or a sale of all the duplexes to one individual solely because it was the only economically feasible way to sell the property. See Ross v. Commissioner,supra;Palos Verdes Corp. v. United States,201 F. 2d 256 (C.A. 9, 1952); Mackall v. United States,supra;Gordon, et al. v. United States,159 F. Supp. 360 (Ct. Cl., 1958). 4. Petitioners acquired no other properties, but merely sold those received from the deceased father's estate. See Kent Industrial Corporation,25 T.C. 215 (1955). 5. The property was sold "as is"; no subdivision activities or even improvements were involved. See Curtis Company v. Commissioner,supra.
6. All gains from the sale of the duplexes were reported on the petitioners' original Federal income tax returns as gain from the sale of section 1231 assets. Section 1231 assets, of course, do not include *383 property held primarily for sale to customers in the ordinary course of their trade or business. We recognize that there are factors present which tend to characterize petitioners as being in the business of selling real estate, such as the fact that Philip Long was deeply involved in setting the criteria for potential buyers, and the rather large number of individual sales over a period of two years. However, viewed as a whole, we find that the preponderance of the evidence would not justify us in holding that petitioners had successfully sustained their burden of persuading us of the error of the respondent's determination. We conclude that the petitioners did not hold the duplexes primarily for sale to customers in the ordinary course of their trade or business. Petitioners also argue that they are not the type of corporation Congress had in mind when it passed the personal holding company provisions in 1934, and that they are precisely the kind of company Congress intended to exempt from personal holding company status when it amended the law to provide the "interest constituting rent" exception in section 403 of the Revenue Act of 1938. The Ways and Means report explained *384 the reason for this exemption as follows (H. Rept. No. 1860, 75th Cong., 3d Sess. (1938), 1939-1 C.B. (Pt. 2) 728, 765): In order to relieve from the surtax imposed by Title IA of the bill certain operating companies whose principal business consists in the development of real estate for sale, Section 403 makes a change in the treatment of certain types of interest as compared with the corresponding provision of the Revenue Act of 1936, as amended. This is done by including within the term "rents", as defined in subsection (g), interest on debts owed to the corporation, to the extent such debts represent the price for which real estate held primarily for sale to customers in the ordinary course of business was sold or exchanged by the corporation. This change will help those bona fide real estate operating companies which might otherwise find themselves subject to tax under Title IA of the bill in years in which, by reason of an inactive market for the sale of real estate, the greater part of their income is derived from interest on second mortgages on property previously sold by them and from rent from property leased pending its sale and the rents in themselves do *385 not constitute 50 per cent or more of gross income. In such cases rent and interest combined will usually exceed 50 per cent of the gross income. Under the proposed definition of "rents," such companies will not be classified as personal holding companies. First, we note that the legislative history talks in terms of "bona fide real estate operating companies." Petitioners were merely leasing companies. See Kent Industrial Corp.,supra. Second, we note that the rules prescribed by the personal holding company provisions are strictly mechanical, and apply even to those corporations that become personal holding companies accidentally without the slightest intent of reducing taxation.[7] "Of course, all personal holding companies were not conceived in sin--many were organized for legitimate personal or business reasons; but Congress has made little distinction between the goats and the sheep." [8] The shareholders could have liquidated the petitioners and transferred their assets to a partnership. Unfortunately they did not, and the personal holding company provisions under the facts as we have found them impose the personal holding company tax on petitioners. *386 2. Unreasonable compensation.
Respondent contends that Long's salary of $7,300 in 1967 and $7,200 in 1968 paid by petitioner Beaconcrest is excessive. He disallowed all but $1,800 a year for each of the two years. Beaconcrest *387 claims it is entitled to deduct Long's salary for 1967 and 1968 under section 162(a)(1)[9] because (1) the amounts paid were reasonable as compensation for services actually rendered by Long to Beaconcrest during those two years, and (2) in any event, they were reasonable for compensation for both past and present services rendered by Long. We find for petitioner on the second basis, although we acknowledge the question is a close one. The reasonableness of compensation is a factual determination, each case turning necessarily upon its particular facts and circumstances. Schneider & Co., Inc. v. Commissioner,500 F. 2d 148 *388 (C.A. 8, 1974) affirming a Memorandum Opinion of this Court; R. J. Nicoll Company,59 T.C. 37, 48 (1972); S. & B. Realty Co.,54 T.C. 863, 872 (1970). No one factor is dispositive. Mayson Mfg. Co. v. Commissioner,178 F. 2d 115 (C.A. 6, 1949), reversing and remanding a Memorandum Opinion of this Court. The burden of proving that the compensation paid is reasonable is on the petitioner. Botany Mills v. United States,278 U.S. 282 (1929). Where, as is the situation here, the corporation is controlled by the employee receiving the compensation, the transaction is subject to particularly close scrutiny. Dielectric Materials Co.,57 T.C. 587, 591 (1972). Petitioners offer no evidence of comparable salaries. However, a listing of the actual duties which Long performed for Beaconcrest refutes the claim of unreasonable compensation for past and present services performed.[10]Long educated himself regarding the area and kept abreast of current developments; he devised unusual and effective marketing techniques; he kept the books and records of the corporation; he negotiated contracts; he *389 prepared maps of the properties; he supervised the employees and advised the independent salesmen; he developed and maintained certain business contracts; he transferred the corporate headquarters into his own home; and he advised purchasers subsequent to sale in order to avoid default. Moreover, Long resigned an established position with what he felt to be a promising future in order to assume the management of petitioners and all the financial uncertainty inherent therein; he was entitled to some compensation for the reduction in position, the loss of security, and the foregone possibilities of advancement with his former employer. See Commercial Iron Works v. Commissioner,166 F. 2d 221, 224 (C.A. 5, 1948), affirming a Memorandum Opinion of this Court. Finally, as president of Beaconcrest he assumed the ultimate responsibilities for the corporation's fate. The precise problem before this Court is not to determine exactly what amount would constitute *390 fair compensation for Long for the services rendered by him to Beaconcrest; we need merely decide whether or not the amounts received during the years in issue were unreasonable and excessive. The parties have stipulated that the effective yearly wage in 1968 in the Seattle area for guards and watchmen was $7,535; for janitors, porters and cleaners $7,056; for maintenance trade workers $7,535; for shipping clerks $8,396; and for city delivery truck drivers $10,286. Considering these statistics in unrelated jobs in the same area, and the duties undertaken by Long in his job, we find that the compensation paid to Long by Beaconcrest was not unreasonable and excessive. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect in the years in issue.↩
2. Section 1231 property is property used in the taxpayer's trade or business, which is depreciable or which is real property, has been held more than 6 months, and which is not inventory or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Section 1231(b) (1).↩
3. From 1960 through 1966 Long received the following compensation as president of each of the petitioners. ↩ Year
Parkside
Beaconcrest
1960
$5,500.00
$ - 0 -
1961
6,000.00 - 0 -
1962
6,000.00
375.00
1963
500.00
7,000.00
1964
200.00
4,300.00
1965
200.00
4,800.00
1966 - 0 -
6,300.00
4. SEC. 542. DEFINITION OF PERSONAL HOLDING COMPANY. (a) General Rule.--For purposes of this subtitle, the term "personal holding company" means any corporation (other than a corporation described in subsection (c)) if-- (1) Adjusted ordinary gross income requirement.-- At least 60 percent of its adjusted ordinary gross income (as defined in section 543(b) (2)) for the taxable year is personal holding company income (as defined in section 543(a)), and (2) Stock ownership requirement.--At any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than 5 individuals. * * * ↩
5. SEC. 541. IMPOSITION OF PERSONAL HOLDING COMPANY TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the undistributed personal holding company income (as defined in section 545) of every personal holding company (as defined in section 542↩) a personal holding company tax equal to 70 percent of the undistributed personal holding company income.
6. Section 543(b) (3) provides in part that: "… [The] term 'rents' means compensation, however designated, for the use of, or right to use, property, and the interest on debts owed to the corporation, to the extent such debts represent the price for which real property held primarily for sale to customers in the ordinary course of its trade or business was sold or exchanged by the corporation↩; * * *." (Emphasis added.)
7. "… [The] petitioner [urges that] the personal holding surtax was enacted to remedy the evil of the 'incorporated pocket book,' deliberately created to reduce the personal taxes of those who created them, and therefore, to impose the tax upon a corporation in petitioner's position is a perversion of the Congressional purpose… It is, however, abundantly clear that Congress, in correcting an evil, is not narrowly confined to the specific instances which suggested the remedy…. In enacting the very section being applied here, Congress was attempting to foreclose the defense, available under [the accumulated earnings tax] that the accumulation of profits was responsive to a legitimate business need." O'Sullivan Rubber Co. v. Commissioner,120 F. 2d 845, 847-848↩ (C.A. 2, 1941). 8. Rudick, "Section 102 and Personal Holding Company. Provisions of the Internal Revenue Code," 49 Yale L. J. 171, 203↩ (1939).
9. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (1) A reasonable allowance for salaries or other compensation for personal services actually rendered; * * * * *↩
10. We are mindful that Long was paid his salary generally from the petitioner with the most money, first primarily from Parkside during 1960, 1961 and 1962, and then from Beaconcrest during 1963 through 1968.↩